430 F.2d 771
 Robert E. BURNS, Appellant,
v.
H. R. SWENSON, Warden of the Missouri State Penitentiary, Appellee.
Robert E. BURNS, Appellant,
v.
H. R. SWENSON, Warden, and F. T. Wilkinson, Director, Appellees.
Robert E. BURNS, Appellee,
v.
H. R. SWENSON, Warden of the Missouri State Penitentiary, Appellant.
Robert E. BURNS, Appellee,
v.
H. R. SWENSON, Warden, and F. T. Wilkinson, Director, Appellants.
 Nos. 19980, 19981, 20003, 20004.
 United States Court of Appeals, Eighth Circuit.
 Aug. 31, 1970, Rehearing Denied Sept. 22, 1970.
 
 Alex Bartlett, of Hendren & Andrae, Jefferson City, Mo., for Robert E. burns.
 Howard L. McFadden, Gen. Counsel, State of Missouri, Dept. of Corrections, Jefferson City, Mo., for Harold R. Swenson.
 John C. Danforth, Atty. Gen., State of Mo., Jefferson City, Mo., for defendants-appellants.
 Before MATTHES, Chief Judge, HEANEY and BRIGHT, Circuit Judges.
 MATTHES, Chief Judge.
 
 
 1
 These appeals and cross-appeals are from a final order entered on July 25, 1969, by the United States District Court for the Western District of Missouri, Honorable John W. Oliver, in two consolidated civil rights actions brought under 42 U.S.C. 1983 on March 10 and August 2, 1966, by Robert E. Burns, an inmate at the Missouri State Penitentiary in Jefferson City. The two suits were later consolidated with similar civil rights actions separately lodged by eight other inmates of the Penitentiary. For reasons not here pertinent, all cases involving inmates other than Burns were dismissed or otherwise disposed of prior to entry of the court's opinion and order of June 26, 1969, reported at 300 F.Supp. 759 (W.D.Mo.1969).[1]
 
 
 2
 This litigation centered on alleged deficiencies, constitutional and otherwise, in the administration of the Penitentiary's condition of the prisoners' quarters, and the disciplinary, medical, and religious treatment accorded the inmates, with particular emphasis on the Maximum Security Unit of the Penitentiary in which all plaintiffs-inmates were celled at the consolidation of these suits. The district court appointed competent counsel to represent jointly all plaintiffs-inmates, held extensive conferences and hearings, took voluminous testimony from almost all parties concerned, including a recognized expert in penology. The judge personally inspected the prison facilities and the living conditions in the Maximum Security Unit. During the 3-year course of the proceedings, a new prison administration, composed of Fred T. Wilkinson, Director of Corrections, and Harold R. Swenson, Warden, was installed. The new Director and Warden undertook to implement certain institutional and procedural reforms at the Penitentiary and voluntarily granted portions of the relief requested in the several suits. The court issued an interim opinion and order of July 16, 1968, reported at 288 F.Supp. 4 (W.D.Mo.1968).
 
 
 3
 Culminating the lengthy controversy is the district court's order of June 26, 1969, granting Burns the following equitable relief: (1) Defendant-prison officials were directed to make appropriate entries in the penitentiary records to indicate that the holding of Burns in Maximum Security Unit was 'legally improper,' and that such entries be made in a manner particularly to so advise the state Board of Probation and Parole, and (2) Burns was to be permitted to correspond with the American Civil Liberties Union (ACLU) concerning the instant or any other case in any court. 300 F.Supp. at pp. 764-765. All other claims for relief were denied.[2] Burns has appealed the denial of his request for additional equitable relief, while Director Wilkinson and Warden Swenson claim on cross-appeals that the relief actually granted is excessive and unwarranted.
 
 
 4
 Each of Judge Oliver's opinions, previously referred to, contain some of the background and detail relevant to Burns' separate suit. A more thorough exposition of the particular and undisputed facts underlying his claims for relief is, however, essential to our opinion.
 
 
 5
 Robert E. Burns commenced serving a 75-year prison sentence on July 15, 1959, at the Penitentiary for conviction on a charge of assault with intent to kill with malice aforethought. His conviction had been affirmed on direct state appeal. State v. Burns, 328 S.W.2d 711 (Mo.1959). Until June 12, 1964, he was confined in the general prison community and was accorded normal and routine treatment and privileges. He was, on occasion, reported and charged with prison disciplinary infractions. On June 8, 1964, three premeditated, violent assaults and a stabbing-murder took place in the F and G Hall tunnel at the Penitentiary. The incident involved several inmates and manifested obvious racial tension. The four victims were Negro while the suspected perpetrators were White. Four days later Burns and five other inmates were taken to and confined in maximum security cells in the Identification and Reception Center. On August 4, Burns was transferred to 'C Basement,' one of the two main wings of the Maximum Security Unit, in which he was continually confined until his release to the general prison community on August 16, 1967. It was stipulated by the parties that Burns was placed in Maximum Security without formal action by the prison's Classification or Disciplinary Committee.[3] Judge Oliver found further that no formal action by Warden Nash (since deceased and the predecessor to Warden Swenson, who took office on July 1, 1965) preceded Burns' segregative assignment. Burns testified that he was first advised of the reasons for his detention about 3 or 4 days following his initial segregation when Warden Nash, in response to inquiry from Burns, stated that he was being held as a suspect in the June 8, assaults pending further investigation.
 
 
 6
 In late September and early October of 1964, Sergeant Maddox, evidence technician with the Missouri State Highway Patrol, investigated the June 8 incident at the request of the Penitentiary officials. The fruits of that investigation were reduced to several reports and were admitted into evidence and sealed in camera, to prevent any feedback of the names of those prisoners interviewed who might otherwise possibly suffer some recrimination at the hands of their fellow inmates. By order of this court, we have independently examined the investigative report. One eyewitness, but none of the three surviving assault victims, positively identified Burns as an assailant. Apparently, the attackers wore face masks to conceal their identities. A copy of Sergeant Maddox's report was forwarded to the Prosecuting Attorney of the county in which the Penitentiary is located. No further investigations were conducted.
 
 
 7
 The first record of any formal action on Burns' assignment is the review of his case on January 15, 1965, by an ad hoc 'Policy Committee,' specially convened in the absence of any established regulation or procedure by direction of Colonel Carter, acting Warden at the time, to review all maximum security cases. Burns appeared in person before this Committee. The entry on the Chronological Data Sheet in Burns' Classification File states: 'It is the decision of the Policy Committee that Burns remain in segregation indefinitely.' No record of transcript of this meeting was preserved.
 
 
 8
 The status of Burns' detention did not receive any formal review again until December 9, 1966. At that time, the Penitentiary's Classification Committee considered his case, but Burns did not appear in person nor was he notified of the review. His status and assignment remained unchanged.
 
 
 9
 After the present suit was initiated and plenary hearings were held, Burns' assignment was again reviewed in his presence and with his knowledge. A memorandum dated June 20, 1967, and signed by a ranking prison official states:
 
 
 10
 'Inmate Burns appeared before the Classification Committee on this date for a routine review and it was felt by the committee that he should remain on Maximum Security Status. Release at this time from maximum security would not be in the best interest of the inmate or the institution. His case will be reviewed again sometime in September, 1967.'
 
 
 11
 On August 16, Burns was discharged from maximum security and returned to the general prison population.
 
 
 12
 The evidence, including Burns' own testimony, reveals that he was anything but a model prisoner while assigned to C Basement. On October 19, 1964, Lt. Stewart, prison officer in charge of C Basement, placed Burns on 'O Hall Regulations'[4] for 11 days for refusing to shave. On Thanksgiving Day of the same year, Burns participated in a brief and concerted noise disturbance. In February of 1965, Burns and other inmates again refused to shave in protest, according to Burns, over obsolete shaving equipment. In his report on Burns' latest incident which occurred on February 2, 1967, Lt. Stewart described him as a 'trouble maker and behind the scenes agitator,' and that 'it is well known that he wishes to cause all the trouble he can.'
 
 
 13
 Shortly after Burns filed the instant suit, he wrote a letter, dated April 21, 1966, to the ACLU in Kansas City, stating that he had filed suit in Federal court and adding, 'As I am not an attorney, I would like to request that the American Civil Liberties Union assist or advise me in this matter if it is possible for it to do so.' The parties stipulated that this letter was not mailed but rather returned to Burns by the Penitentiary mail room, stamped 'Not Approved for Mailing.' The ACLU did not appear on the correspondence list submitted by Burns. It is clear that neither Burns nor anyone else in his behalf attempted to further to correspond with that organization.
 
 APPEALS IN NOS. 19,980 and 19,981
 
 14
 Burns, appellant, complains because the district court did not grant him all the equitable and injunctive relief he had requested. He submitted 15 specific requests for such relief. A summary of the relief requested is found at 300 F.Supp. at 763-765.
 
 
 15
 We begin with the observation that Federal court review of state prisoners' complaints arising out of the internal administration, conditions, or discipline in the prison is narrowly circumscribed. Unless deprivations of constitutional dimensions are involved, Federal courts should be loathe to interfere.
 
 
 16
 'Lawful incarceration necessarily operates to deprive a prisoner of certain rights and privileges he would otherwise enjoy in the free society, a retraction justified by considerations underlying our penal system. Price v. Johnston, 334 U.S. 266, 285, 68 S.Ct. 1049, 92 L.Ed. 1356 (1948); Jackson v. Bishop, 404 F.2d 571 (8th Cir. 1968). A convict, however, does not lose all of his civil rights-- for those that are fundamental follow him, with appropriate limitations, through the prison gate, and the walls do not foreclose his access to the courts to protect those rights. Sharp v. Sigler, 408 F.2d 966 (8th Cir., March 24, 1969); Jackson v. Bishop, supra. On the other hand, prison officials are vested with wide discretion in controlling prisoners committed to their custody, Douglas v. Sigler, 386 F.2d 684 (8th Cir.1967); Stroud v. Swope, 187 F.2d 850, 851 (9th Cir.1951), and it is elementary that unless an infringement upon constitutional or fundamental rights is involved, federal courts are naturally reluctant to interfere with a prison's internal discipline, whether the institution is federal or state. Sharp v. Sigler, supra; Jackson v. Bishop, supra.'
 
 
 17
 Courtney v. Bishop, 409 F.2d 1185, 1187 (8th Cir.), cert. denied, 396 U.S. 915, 90 S.Ct. 235, 24 L.Ed.2d 192 (1969). See also Howard v. Swenson, 426 F.2d 277 (8th Cir.1970).
 
 
 18
 The first portion of the equitable and injunctive relief sought and denied to Burns is based upon the assumption that he will, in the future, be recommitted to the Maximum Security Unit for an indefinite period of time without any hearings or a periodic review of his status. We agree with the district court that such speculative relief is wholly unwarranted.
 
 
 19
 The remainder of the relief proposes that the district court order Director Wilkinson and Warden Swenson to initiate, promulgate, and implement certain internal prison regulations and procedures. Some of these touch matters provided for by state law-- the statutory requirement that inmates be provided with the rules and regulations governing their own conduct and be apprised of the rules regulating subordinate penal officers, Mo.Rev.Stat. 216.405 (1959), and the statutory authority vested in the Warden to unilaterally segregate habitual or hopeless incorrigibles until reduced to submission and obedience, id. 216.455. Other relief seeks written procedures on, inter alia, periodic inspections of maximum security facilities, investigation of abuses by custodial personnel, access to religious services for maximum security inmates, and the right of disciplinary review prior to imposition of punishment.
 
 
 20
 Certainly, the foregoing requested relief may be desirable in the context of modern penology and its emphasis on inmate rehabilitation. See generally American Correctional Association, Manual of Correctional Standards 266-68, 401-21 (1966). But, as the district court observed in both of its opinions, the incumbent prison administration has through progressive action initiated needed reforms designed to improve the physical facilities of the penitentiary, and to create a more placid and cooperative attitude on the part of the inmates. To be sure, the optimum has not yet been attained. Appellees acknowledge that other reforms are under consideration and are subject to further evaluation and constant refinement through actual practice. In the present posture of the suit, the degree to which the prison officials may have departed from desirable procedures or state standards cannot be magnified into a fundamental constitutional error mandating a decree from this tribunal. Cf. Sostre v. Rockefeller, 312 F.Supp. 863 (S.D.N.Y.1970). Hence, we affirm the district court's judgment on these appeals.
 
 APPEALS IN NOS. 20,003 and 20,004
 
 21
 Director Wilkinson and Warden Swenson (appellants on these cross-appeals) challenge as wholly unwarranted the specific relief granted Burns by the district court. We consider first the court's order providing that Burns shall be permitted to correspond with the ACLU concerning this or any other case in any court.
 
 
 22
 It is now settled that 'access of prisoners to the courts for the purpose of presenting their complaints may not be denied or obstructed.' Johnson v. Avery, 393 U.S. 483, 485, 89 S.Ct. 747, 749, 21 L.Ed.2d 718 (1969). See also Lee v. Tahash, 352 F.2d 970 (8th Cir. 1965); Sigafus v. Brown, 416 F.2d 105, 107 (7th Cir.1969); Coleman v. Peyton, 362 F.2d 905, 907 (4th Cir.), cert. denied, 385 U.S. 905, 87 S.Ct. 216, 17 L.Ed.2d 135 (1966).
 
 
 23
 This court aptly observed in Lee v. Tahash, supra, that restrictions on correspondence may rise to unlawful administration of a prison sentence where such restrictions are excessive, or where an absolute right which the law secures to a prisoner is infringed or denied as a result of the restrictions. We further emphasized that restrictions will not be allowed to operate to deny a prisoner access to federal courts for presentation of alleged legal wrongs. Here, Judge Oliver found that there is no evidence that Burns has been denied access to the courts. 300 F.Supp. at 764. Certainly, these actions attest to the accuracy of that conclusion.
 
 
 24
 In light of the prevailing authority as announced in the above cited cases, and Director Wilkinson's expressed non-opposition to Burns' corresponding with the ACLU, we are not persuaded to strike down the district court's order in its entirety. There is, however, a weighty interest in the security and orderly administration of the internal affairs of the penal institution. Thus, we are led to the conclusion that an inmate of the Missouri Penitentiary should not be given a carte blanche mailing privilege, which is the precise effect of the order under attack.
 
 
 25
 Accordingly, the district court's order is modified by ingrafting thereon the limitation that correspondence with the ACLU may be subjected to reasonable regulation consistent with legitimate policies of internal prison administration and security, so long as such regulation does not become a subterfuge to deny Burns access to the ACLU, and through it, to the courts. As so modified, the order is affirmed.[5]
 
 
 26
 A more troublesome question is presented by the district court's order requiring the prison officials to note on Burns' prison record that his entire detention in the Maximum Security Unit was 'legally improper.'[6] We have searched in vain through both of Judge Oliver's reported opinions and his several orders in this case for any expression of the reasons why Burns' segregated detention was determined to be 'legally improper.' There is nothing save the court's brief approval of paragraph 5 of Burns' requested order with the words, 'Such relief should and will be granted if such action has not already been taken.' 300 F.Supp. at 764. We are consequently left to our own devices in considering these cross-appeals. Burns' counsel has conveniently submitted four alternative constitutional theories which he asserts will buttress the district court's order. We consider those arguments seriatim.
 
 
 27
 First, Burns' confinement in maximum security cannot be considered illegal as contravening the cruel and unusual punishment ban of the Eighth Amendment. Having viewed the maximum security facilities at the Penitentiary, Judge Oliver stated in his first reported opinion that, 'although we found the living areas to be in need of improvement, we do not believe the conditions to be such as to constitute cruel and unusual punishment, within the meaning of the Constitution of the United States.' 288 F.Supp. at 8. We accept that conclusion by the district court, and Burns does not direct particular criticism thereto. Instead, he intimates either that confinement in maximum security is itself cruel and unusual punishment, or that he was showered with such physical abuse while so confined that his entire detention must be raised to an unconstitutional plateau. Persuasive authority teaches that segregated confinement in solitary or maximum security is not per se banned by the Eighth Amendment. See Courtney v. Bishop, supra, 409 F.2d at 1187; Ford v. Board of Managers of New Jersey State Prison, 407 F.2d 937, 940 (3d Cir.1969); Graham v. Willingham, 384 F.2d 367, 368 (10th Cir.1967). Furthermore, having carefully combed the record we are convinced that this is not a case where a prisoner has been administered physical and mental abuse or corporal punishment of such base, inhumane, and barbaric proportions so as to shock and offend a court's sensibilities and the Eighth Amendment as well. See, e.g., Jackson v. Bishop, 404 F.2d 571 (8th Cir.1968); Wright v. McMann, 387 F.2d 519 (2d Cir.1967); Hancock v. Avery, 301 F.Supp. 786 (M.D.Tenn.1969); Holt v. Sarver, 300 F.Supp. 825 (E.D.Ark.1969); Jordan v. Fitzharris, 257 F.Supp. 674 (N.D.Calif.1966).
 
 
 28
 Second, we do not agree that Burns has been denied equal protection of the laws, guaranteed by the Fourteenth Amendment. He claims that over a period of years state officials treated him completely at odds with explicit state statutory commands relating to corrections, Mo.Rev.Stat. Ch. 216 (1959), and to the Administrative Procedure Law, id. Ch. 536, Mo.Const. Art. 5 22, and that such inferior treatment amounted to invidious discrimination. We believe that Burns has misconceived an essential element to any equal protection challenge: The alleged invidious discrimination must be against one person in favor of another person or class of persons, with no rational basis for any differentiation in treatment. See Marquez v. Aviles, 252 F.2d 715, 717 (1st Cir.), cert. denied, 356 U.S. 952, 78 S.Ct. 917, 2 L.Ed.2d 845 (1958); Everlasting Development Corp. v. Sol Luis Descartes, 192 F.2d 1, 7 (1st Cir.1951), cert. denied, 342 U.S. 954, 72 S.Ct. 626, 96 L.Ed. 709 (1952).
 
 
 29
 The equal protection doctrine is rooted in a comparison of the actual treatment accorded one person with that actually accorded other persons or class of persons, not in a comparison of the actual treatment accorded one person as measured against the ideal treatment, proscribed by the norms of state law, which that single person should have received. In the latter situation, there is simply no discrimination, invidious or otherwise. And, the failure of state officials to measure up to statutory standards in the administration of state laws does not alone assert a constitutional wrong. We find no persuasive evidence that Burns received treatment from the prison administrators which was substantially and invidiously dissimilar to that received by other inmates confined in the Penitentiary's Maximum Security Unit.
 
 
 30
 Third, Burns poses the suggestion that the Ninth Amendment,[7] aided by Griswold v. Connecticut, 381 U.S. 479, 85 S.Ct. 1678, 14 L.Ed.2d 510 (1965) supports the district court's order. Counsel for Burns concedes that the extent and effect of Griswold, in 'prisoner rights' cases has not, to his knowledge, been considered by the courts, and invites us to expand the Griswold teachings to this and other inmate cases. We decline the invitation.
 
 
 31
 Burns would have us ascribe Constitutional dimensions to penal treatment which is substantially less severe than that banned by the Eighth and Fourteenth Amendments. Griswold does not dictate an adjudication that Burns' confinement in the Maximum Security Unit deprived him of a constitutionally protected right. The Ninth Amendment claim has been accorded due consideration. It is devoid of merit and must be rejected.
 
 
 32
 Burns finally contends that the district court's order is supportable on the theory that he was denied due process of law as guaranteed by the Fourteenth Amendment. The argument is not without some merit. The record is clear that Burns was not afforded a formal hearing or a file review by any prison committee or official from the time he was first segregated in maximum security in June of 1964 until he appeared in person before a Policy Committee in January of 1965. His case was not again formally reviewed until almost 2 years later. Inordinate delays in reviewing the file of a segregated inmate should be avoided. Based upon the regulations promulgated during the pendency of this action, and the testimony of Director Wilkinson, lengthy delays and infrequency in conducting formal hearings on maximum security detainees are unlikely to occur again.[8] Although we do not condone the procedures pursued in regard to Burns' detention in maximum security, we are unwilling to hold in the context of this case that he was deprived of constitutional due process.
 
 
 33
 The Constitution does not require that every inmate must in every instance be given a formal hearing prior to segregation in maximum security. This course of procedure, although desirable, is not always practical. The exigencies of unusual or emergency situations dictate that an inmate be unilaterally segregated first, with a hearing provided later. It certainly does no violence to the Constitution or the sensibilities of this court, for example, for prison authorities to unilaterally and without hearing segregate riotous or troublemaking prisoners from the general prison population when the Penitentiary atmosphere is charged and tense. The preservation of security and order, both for the segregated inmates and for the general prison population, as well as the prison officers and administrators, must be allowed high priority. Here, a violent stabbing and several contemporaneous assaults manifesting racial hatred among the inmates had occurred. The prison authorities apparently had reason to believe that Burns and other inmates had participated in the incident. Exigent circumstances known only to the prison officials may have required the foregoing of any hearing at the time of Burns' segregation. The remaining delay must have related to the necessities of investigation of the incident and the continued tension in the prison. We cannot hold that the 6-month delay before Burns' case was reviewed and he was allowed a hearing amounts per se to a deprivation of any constitutional right. See Courtney v. Bishop, supra.[9]
 
 
 34
 On January 15, 1965 Burns' status was reviewed in his presence, and the ad hoc Policy Committee determined that he should remain in segregation. His Classification File thoroughly reviewed by us establishes adequate reason for the Committee's decision. Burns has a long criminal record extending back to the 1940's. He has been in and out of prison and jails during most of his adult life. His prison record shows a definite hostility to authority and a continuous string of prison conduct violations, some of which necessitated punitive segregation. A Classification Summary of August 19, 1966, said that he was incorrigible. All reports on him indicate that he evinced no inclination toward rehabilitation and subsequent return to normal law-abiding society.
 
 
 35
 While there was no formal review of Burns' status and assignment in maximum security for almost 2 years, it was subjected to informal review on several occasions. On June 9, 1966, Director Wilkinson wrote him a letter in response to one he had mailed a month previously to Governor Warren Hearnes, complaining of his unjust incarceration. Director Wilkinson stated, 'I have, of course, been familiar with your record and have made a study to see if there have been any recent developments.' Further on, Director Wilkinson recounted Burns' criminal history and stated, 'I am sure you do not seriously question your classification under maximum security.' And, according to Burns' own testimony, he spoke to Warden Swenson on several occasions about his continued detainment. While these brief conversations do not amount to full-blown plenary hearings, Burns' criminal record and his intractable attitude do not reveal that his assignment would have been altered had his case been formally reviewed by the prison's Classification Committee every 6 months, as the present regulations provide. Indeed, the review of Burns' file of December 9, 1966, and his in-person review of June 20, 1967, resulted in his continuation on maximum security status. Under the peculiar circumstances of this case, then, we are constrained to find no constitutional error. Thus, the district court's order that Burns' maximum security confinement was 'legally improper' cannot stand.
 
 
 36
 We note finally that the practical consequences of the district court's order are of questionable impact. It is true Burns was denied merit time while segregated in maximum security. Yet, the date of discharge from the Penitentiary for a prisoner, particularly one serving a long term sentence, is not so much affected by any accumulation of institutional merit time as it is by the evaluative decisions of the Missouri Board of Probation and Parole. That Board has been accorded almost unlimited discretion and flexibility in determining whether or not to grant parole to an inmate. Mo.Rev.Stat. 549.261(1) (1959). An inmate with a prison disciplinary record, or one presently segregated in administrative or punitive detention, is not treated with any formal distinction from any other inmate, except that the prisoner with a bad-conduct record may not be eligibile for parole until he has served two-thirds or 2 years of his sentence, whichever is less, rather than one-third or 1 year. Id. 549.261(2). The Board members look to numerous records, facts, reports, and other information in making their particularly subjective decisions. In light of Burns' lengthy criminal record, his numerous violations of prison rules, coupled with a manifestation of incorrigibility, a determined purpose to flout prison authority, and a demonstrated opposition to rehabilitation, self induced or otherwise influenced, all clearly revealed in his bulky Classification File, we are persuaded to believe that a court order declaring his 3-year segregation in maximum security to be 'legally improper' would have miniscule effect on the Board's judgment of Burns' preparedness for return to law-abiding society. His slate of a lifetime of lawlessness cannot be cleaned by one wipe of the judicial eraser.
 
 
 37
 The district court's order relating to correspondence with the ACLU is modified, and as modified, affirmed. The district court's order relating to the legality of Burns' maximum security detention is reversed.
 
 
 
 [1]
 The final order upon which this appeal is based, entered July 25, merely reaffirms the order and opinion of June 26 in all respects material to the issues and contentions raised herein. Hence, the decisions embodied in the earlier June 26 order provide the real grist of controversy for the appeals and cross-appeals to this court
 
 
 [2]
 Burns included as part of his prayer for relief in his second civil rights suit, our Nos. 19,981 and 20,004, a claim for actual and exemplary damages against the defendant-prison officials. He voluntarily waived that claim with respect to the present consolidated cases in March of 1969, and the district court's final order of July 25 dismissed all such damage claims with prejudice
 
 
 [3]
 A Classification Committee is required by statute. Its membership and duties are specified in Mo.Rev.Stat. 216.212 (1959). The Associate Warden for Treatment testified that the Committee met thrice weekly to consider and act upon inmate classifications, and that it followed a flexible, informal, and unwritten procedure for review of assignments to maximum security
 
 
 [4]
 'O Hall Regulations' at that time was punitive segregation of maximum security inmates amounting to detention in a 'strip cell' without furnshings and provision for but one meal a day. Such incarceration is authorized for a maximum of 10 days after proper hearing by Mo.Rev.Stat. 216.455(1), which refers to confinement 'in isolation upon short allowance.'
 
 
 [5]
 We note in passing that Chief Judge Becker, also of the Western District of Missouri, recently held that the allegation of an inmate of the Missouri State Penitentiary that he was 'hampered' in his request for aid from the ACLU did not, without more, state any claim of violation of a federally protected right. Hand v. Wilkinson, Civ.No.1568 (W.D.Mo., March 25, 1970)
 
 
 [6]
 This particular question has not become moot by reason of Burns' discharge from maximum security in August of 1967. While segregated for the 3-year period, Burns could not accumulate 'merit time' under the regulations then in effect, and the record of a maximum security detention may have some effect on his chances for a parole. The district court's order here was specifically tailored to, in effect, expunge the 'bad time' stigma formally and informally associated with a maximum security assignment from Burns' prison record
 
 
 [7]
 The Ninth Amendment provides: 'The enumeration in the Constitution, of certain rights, shall not be construed to deny or disparage others retained by the people.'
 
 
 [8]
 Under the rules and regulations contained in the Personnel Informational Pamphlet, promulgated in September of 1967 and distributed only to prison officers and officials, the Classification Committee of the Penitentiary shall determine whether an inmate will be assigned to maximum security. If an assignment is made unilaterally by certain prison officials and without hearing, as when specified emergency or unusual circumstances so require, then the inmate must be informed in writing as soon as possible after detention of the reason for his assignment, and the unilateral action must be reviewed at the next regular meeting of the Classification Committee, but in no event later than 2 weeks after the initial assignment. Provision is also made for mandatory and periodic reviews of the status of maximum security detainees, with the presence of the inmate. The period of time from one review to the next may not exceed 6 months
 
 
 [9]
 In Courtney the prisoner-appellant had been placed in solitary confinement in the Arkansas State Penitentiary from July 16, 1967, to January 4, 1968. The Penitentiary rules specified that an inmate be given a hearing before an appropriate board of inquiry prior to being isolated in solitary confinement for breach of specified prison rules. Appellee, the Superintendent of the Penitentiary, admitted that Courtney was unilaterally assigned to solitary and had never received any hearing at any time prior to or during his segregation. However, appellee observed that Courtney had been stabbed by a fellow inmate and had later, in kind, stabbed his assailant. Hence, appellee argued that the assignment to solitary had been for administrative segregation-- for the security and protection of Courtney himself as well as the general prison population-- and not as punishment for breach of prison rules. The district court agreed with appellee, and we affirmed, saying, 'This phase of the case obviously relates to the internal affairs of the penal institution. Where, as here, the lack of an inquiry did not deprive the prisoner of a fundamental constitutional right, the courts will not interfere.' 409 F.2d at 1188. The analogy of Courtney to the instant facts is very close, and our decision there is of controlling weight