**Donald BEISHIR, Plaintiff,**

v.

**Harold R. SWENSON et al., Defendants.**

**Nos. 1465, 1496, 1541.**

United States District Court,
W. D. Missouri, C. D.

June 28, 1971.

See also D.C., 331 F.Supp. 1224.

Willard B. Bunch, William B. Morgan, Gerald R. Walsh, of The Legal Aid and Defender Society of Greater Kansas City, Mo., for plaintiff.

Gene E. Voigts, First Asst. Atty. Gen. of Missouri, Kenneth M. Romines, Asst.

Atty. Gen. of Missouri, Howard L. Mc-Fadden, General Counsel, Department of Corrections, State of Missouri, Jefferson City, Mo., for defendants.

## FINDINGS AND OPINION

ELMO B. HUNTER, District Judge.

Plaintiff, Donald Beishir, a state convict confined in the Missouri State Penitentiary, seeks damages and injunctive relief pursuant to 42 U.S.C. § 1983, to redress the alleged deprivation, under color of state law, of rights secured to him by the eighth and fourteenth amendments to the Constitution. In addition to monetary damages, plaintiff Beishir seeks injunctive and declaratory relief under 28 U.S.C. § 2201 and § 2202. Federal jurisdiction is invoked under 28 U.S.C. § 1343.

Plaintiff alleges four grounds for relief. First, plaintiff alleges that the administrative procedure under which he was placed in maximum security, with a resulting loss of good time, constituted action taken under color of state law which allegedly deprived him of liberty and property without due process of law. As a second ground for relief, he alleges that his eighth amendment right to be free from cruel and unusual punishment was violated as a result of the prison administration's use of a fire hose and mace to quell a disturbance in June of 1969. Third, Beishir alleges his eighth amendment rights have been violated through indefinite and extended confinement in maximum security. Fourth, plaintiff alleges he has been subjected to confinement in maximum security disproportionate to the offenses he is alleged to have committed.

The Court appointed Willard Bunch, of the Legal Aid and Defender Society of Greater Kansas City, who was later joined by William Morgan and Gerald R. Walsh of the same office, to represent this plaintiff and eight other inmates in similar civil rights actions pending in this Court. Pursuant to Rule 42(a), F.R. Civ.P., and with the consent of all parties, plaintiff's case was consolidated for trial with the actions brought by Raymond Milentz, Eddie Umfress, Ronald Westberg, Billy Joe Tyler, Frank Boedeker, Frank Howard, Daniel Wilwording, and Ronald Berry. During the weeks of March 28, 1971, and April 4, 1971, the consolidated trial involving both legal and equitable issues, again with the consent of all parties, was tried to the Court sitting without a jury as provided for in Rule 39(b), F.R.Civ.P.

The trial commenced with evidence on the issues raised by plaintiff's second ground for relief dealing with a hosing and macing incident of June 29, 1969, and proceeded with evidence to support the equitable relief sought in what has been referred to as plaintiff's first, third and fourth ground for relief.

At all relevant times defendants were employees of the Missouri State Penitentiary. Defendant Swenson was then and is now the Warden and the highest administrative officer of the penitentiary. Defendant Wyrick was in June and July of 1969, an assistant to the Warden and a captain of the guard force of the penitentiary. Defendants Smith, Vestal, Steele, Troyer, Hill, Stewart and Borghardt were then and are now members of the guard force commanded by defendant Wyrick.

Donald Beishir commenced serving a life sentence in June of 1958, at the penitentiary after his conviction for first degree robbery. In April, 1967, Beishir was convicted of second degree murder and sentenced to life imprisonment.[1] The instant action is based on the events which occurred in the institution during the latter part of June, 1969.

From all the testimony and evidence in this case the Court finds the follow-

---

1. During his most recent confinement in the Missouri State Penitentiary, plaintiff Beishir has accumulated twenty-eight written conduct violations. These include refusal to work, threatening violence to an officer, passing dope, eight separate violations for possession of contraband, creating a disturbance in the visiting room and eight separate incidences of creating a general noise disturbance.

ing to be the credible facts: On June 26, 1969, Beishir celled with Daniel Wilwording in C Unit South. C Unit South is one of the two main wings of the maximum security unit. Maximum security contains two tiers of cells on each of its two wings. The two tiers on the east side are called B Unit while the two on the west side are called C Unit. Both B and C units contain north and south sides. Immediately above the maximum security area which contained about 110 inmates, approximately 400 general population inmates were housed.

Beginning in early June, 1969, the conditions in the institution were charged and tense, bordering on riot. Fred T. Wilkinson, Director of the Department of Corrections for the State of Missouri and a professional penologist with some 33 years experience, characterized 1969 as a troublesome year for prisons in the State of Missouri. Tension was evident in the penitentiary in June, 1969, as a result of the placement of a portion of the population in maximum security. This placement was the result of an effort by the prison administration to break up gangs and rackets which had been running rampant in the institution. As a result of the segregation of many of the leaders, strong-arm tactics and assaults decreased enormously. Chronic agitators, however, sought to disrupt the institution in hope of reestablishing the rackets, loan sharking, drug trafficking and general preying upon the population.

Warden Swenson also viewed 1969 as a "year of tensions." There had been a riot, tensions of a racial nature and three murders during the year. Tensions increased following a two day sit-down strike waged by some of the inmates. Disturbances in maximum security became more frequent and finally culminated in the June, 1969, incident.

There is no dispute concerning the basic events of June 25–28, 1969. On June 25, 1969, what was described by the inmates as a "protest" began. The protest originated in C Unit South and took the form of burning newspapers, towels, mattresses, sweatshirts and other combustible items. The smoke was so thick it was difficult for inmates to breathe and various inmates' eyes burned. The extent of the fires was best characterized by inmate Berry who conceded a line of fires extended from cells 17 to 31. In addition to the burning, the inmates participated in a noise disturbance and engaged in cell flooding. This flooding was so severe that the walkways in front of the cells contained water and contaminated other cells.

On June 26, 1969, inmate dormitory workers with mops and janitorial supplies entered C Unit South to clean the area. The disturbance continued through the evening of the 26th until 4:45 a. m. On the evening of the 26th Warden Swenson received a report of additional disturbances and directed that the fires be put out and water shut off whenever flooding occurred. As a result of the flooding it became necessary to shut the water off and control toilet flushing from the valve located in the service tunnel.[2]

Upon arriving for work on the morning of the 27th, Warden Swenson called a meeting for 7:45 a. m. to discuss what action should be taken to quell the disturbances and restore order in maximum security. Messrs. Wilkinson, Casey, White, Wyrick, Steele, Schulte and Kester attended the meeting. As a result of the meeting it was decided that if another disturbance of severe proportions occurred, the leaders would be removed from their cells and placed in seclusion cells located in B Unit.[3] At approximately 11:45 a. m. another major dis-

2. The cells in this area are back to back with a service tunnel running behind each cell on the tier.

3. Personnel working in the area compiled a list of the inmates who refused to settle down after repeated warnings. Warden Swenson presented this list to those present at the meeting, thus disclosing the identity of the inmates subject to removal.

turbance occurred which, in the opinion of the administration, threatened to disrupt the order of the entire institution, particularly the inmates in general population. Upon receiving a call from Capt. Wyrick, Warden Swenson directed that the plan agreed upon earlier that morning be implemented. Carl White, Associate Warden of Custody, commanded the Emergency Squad [4] which undertook to move, without the use of force, selected individuals from C Unit South to seclusion cells located on the B Unit side. As a part of this move plaintiff Beishir was ordered out of his cell, directed to strip and was searched for concealed weapons. After the search and return of his shorts, Beishir was handcuffed with plastic restrainers and transferred to a seclusion cell.

Each seclusion cell is an enclosure approximately six feet wide, nine feet in length and twelve feet high. The cells are fronted by bars with a vestibule area, approximately three to four feet long and six feet wide, located between the barred front and the walkway. A wooden door, with a four inch ledge beneath it, opens from the vestibule to the outside walk. Windows on the front wall of the vestibule open onto the walkway in such a fashion as to block passage. Each seclusion cell contains a sink, toilet and built-in sleeping unit. In addition, cell 17 contained one sleeping mat and a portion of another as well as the personal belongings of inmate Foster who occupied the cell prior to June 27, 1969. As in C Unit South, the toilets and sinks could be controlled and shut off from the outside.

Plaintiff Donald Beishir, with the plastic restraints remaining on his hands,[5] was placed in cell 18 with inmates Westberg, Umfress, Wilwording, Baker, Medley, Goodman and Edmonds, at approximately 1:00 p. m. on June 27, 1969. As a result of the crowded conditions plaintiff was unable to lie down when others occupied the limited space available.[6] Although security prohibited the distribution of normal meal utensils, plaintiff received two sack lunches per day, which is the normal procedure in "lockup conduct problems".

After Beishir was placed in his seclusion cell and until the evening of June 29, 1969, there was intermittent shouting by various men in the maximum security seclusion cell area. The noise disturbance continued the 27th after the move and was made by "every conceivable manner." These disturbances continued June 28, 29, and spread to those inmates remaining in the regular maximum security area. The continuous boisterous conduct indicated to Warden Swenson that the inmates should not be released to their regular cells.

On June 29, 1969, at 7:30 p. m. Warden Swenson was informed that two seclusion cells, numbered 17 and 18 were completely out of control with flooding, screaming and noise making. Warden Swenson directed a few members of the E-Squad be called in to quell the disturbance. On his way from his home to the institution, Warden Swenson could hear the noise coming from the maximum security section of the building. On Swenson's arrival at the prison, a conference was held with the members of the

4. The Emergency Squad (E-Squad) consists of a number of guard personnel formed to deal with emergency conditions. The members receive additional training through bi-weekly sessions. Part of the program consists of training in the use of mace.

5. The restraints in question were described by Beishir as made out of plastic, approximately ⅛ in. wide and approximately ½ inch thick. This apparatus was 20 inches long and had a locking device on

each end. Beishir experienced little difficulty in effecting a removal by rubbing the device on the concrete edge of the toilet.

6. At this time maximum security, with a capacity of 105, housed 110 inmates. Director Fred Wilkinson negotiated with other institutions and on July 3, 1969, 11 inmates were moved to Moberly, Mo., thus allowing the return of Beishir to regular maximum security.

E-Squad present and the previously developed plan of action was discussed and explained. In restating the plan to those present at the conference, Swenson specified the first step would be to "talk and counsel" the inmates in an attempt to reason with them and thereby quell the disturbance. If this was not successful and the riotous conduct continued a fire hose with limited water pressure would be directed into cells where rioting was occurring. If this action failed it would be necessary to resort to the next level of force, the use of chemical mace.

Associate Warden Wyrick and Lt. Steele drew mace from the rotunda.[7] Officers Stewart and Borghardt drew batons. Upon the arrival of the mentioned E-Squad members in maximum security, Warden Swenson directed that the cell windows which extended into the corridor be closed and he then attempted to quiet the occupants by talking with them. Rather than improving the situation, the noise increased to the point that Swenson could not be heard. It was at this point that Swenson was spat upon, and a gallon of water thrown on him by Beishir.

When it became apparent that the "talk and counsel" method would not establish order, Warden Swenson signaled Capt. Wyrick to proceed with the fire hose. As Capt. Wyrick and Officer Hill unrolled the hose the inmates in cell 17 grabbed sleeping mats and held them up to the bars. Officers Borghardt and Stewart used their batons to push or punch down the mats so that the water could be directed into the cell. There is no credible evidence that the batons were used for any other purpose or that anyone was injured through their use.

After cell 17 was very briefly "hosed", Capt. Wyrick and Officer Hill moved to cell 18 where the hosing operation was repeated. It became apparent that the hosing operation which involved the use of minimal force was totally ineffective and that it was necessary to advance to the use of mace.

Only Officers Wyrick and Steele had been issued Mark IV Chemical Mace. These two officers directed one second bursts of this mace into cells 17 and 18 to the extent they believed necessary to quell the disturbance and establish order.

Plaintiff Beishir testified the mace caused him to gasp and choke as he retreated from the front of the cell to the back with his face towards the rear wall. Thereafter, the wooden doors on cells 17, 18, and 20 were closed and the windows opened as the defendants left the area. On June 30, 1969, guard officers opened the doors to cells 17, 18, and 20, and brought Beishir before the Adjustment Board.

Sumner M. Kalman, a doctor of medicine and professor of pharmacology at Stanford University Medical School, was called to testify to the effects of chemical mace. He testified that upon contact with the human body, the active ingredient, chloracetophenone, may produce intense pain and a rash and reddening of the skin. Jack L. Pinkus, a chemist called by defendants, testified that the ingredients of Mark IV Chemical Mace when applied to the skin do cause pain and that the principal ingredient is an irritant.

Fred T. Wilkinson testified both as an expert and as one who had some personal knowledge of at least a portion of the events. He was present at the staff meetings and participated in the formulation of policy and procedures that were to be used to restore order to the institution in the event of continuing rioting or disorder. The plan, as formulated with his assistance, contemplated first, that the inmates be orally requested to return to orderly conduct and to observe the institution's regulations; secondly, that if the request was not heeded the inmates were to be ordered to comply; and third, if they failed the squad mem-

---

7. The guards are not permitted to carry mace in the institution. As a matter of policy mace must be withdrawn on proper authorization.

bers and prison personnel were to use only that degree of force necessary to restore order, starting with the least force, hosing; to be followed by the use of mace if the hosing was ineffective. He testified the only other available alternative would have involved the use of greater force such as the use of sickening gas, clubs or firearms which definitely were not a part of the plan to restore order to the institution.

Mr. Wilkinson categorized the talking to the inmates, followed by the hosing, and when that proved ineffective the guarded use of the mace, as being strictly a defensive measure made necessary by the emergency situation and not corporal punishment. He gave it as his expert opinion that both the plan and the actions taken under the plan were well within good prison practice. He also stated that the closing of the cell doors after the hosing and macing was likewise an acceptable practice to assist in cutting down on the spread of the noise and disorder to other portions of the penal institution. He indicated it would have been ineffective to close the doors prior to the hosing and macing as the closing of them at that point would not have stopped the disruption nor sufficiently have cut down on the noise level then taking place.

Maurice Sigler, Director of the Department of Corrections for the State of Nebraska, with 32 years experience in the penal field, agreed with Mr. Wilkinson that the standards developed in the riot plan conformed to good prison practice. He also testified that good prison administration dictated that the riot or disturbance leaders be identified as soon as possible and placed together so as to consolidate them and not let them have a wide range to spread or further incite disorder.

Mr. Noah Aldrich, Warden of the Federal Penitentiary at Louisburg, Pennsylvania, with experience in prison administration for 30 years, testified in response to a hypothetical question reciting the substance of the events of June 29, 1969, that the action taken by Warden Swenson and his staff complied with acceptable prison practice. Mr. George Beto, Director of the Texas Department of Corrections since 1962, who currently supervises 14 institutions, testified that in his expert opinion the use of a fire hose followed by mace in a riotous type situation such as described in the instant case was within accepted prison practice. It is his belief that mace creates docility which is salutary in prison administration.

█ The legal principles applicable are not in serious dispute. The cruel and unusual punishment clause of the eighth amendment is applicable to the states through the due process clause of the fourteenth amendment. Robinson v. California, 370 U.S. 660, 82 S.Ct. 1417, 8 L. Ed.2d 758 (1962). The Civil Rights Act, 42 U.S.C. § 1983, creates a cause of action for deprivations, by persons acting under color of state law, of rights secured by the Constitution and federal laws. Monroe v. Pape, 365 U.S. 167, 81 S.Ct. 473, 5 L.Ed.2d 492 (1961). And it is clear that persons confined in state penal institutions may invoke the protection afforded by 42 U.S.C. § 1983. Cooper v. Pate, 378 U.S. 546, 84 S.Ct. 1733, 12 L.Ed.2d 1030 (1964). The right to be free from cruel and unusual punishment is one of the rights that a state prisoner may, in a proper case, enforce under § 1983. Talley v. Stephens, 247 F.Supp. 683 (E.D.Ark.1965); United States ex rel. Hancock v. Pate, 223 F.Supp. 202 (N. D.Ill.1963); Courtney v. Bishop, 409 F. 2d 1185 (8th Cir. 1969).

█ The maintenance of discipline in prison is an executive function with which the judicial branch ordinarily will not interfere. It is the rule that while matters of state prison discipline are not ordinarily subject to examination in the federal courts, the rule is otherwise if the treatment of the prisoners is of such a nature that their federal constitutional or statutory rights are violated. See: Burns v. Swenson, 430 F.2d 771 (8th Cir. 1970); Howard v. Swenson, 426 F. 2d 277 (8th Cir. 1970); Haines v. Kern-

er, 427 F.2d 71 (7th Cir. 1970); Holt v. Sarver, 442 F.2d 304 (8th Cir., 1971). That federal jurisdiction is founded on a deprivation is apparent from an examination of the statute:

"Every person who, under color of any statute, or ordinance, regulation, custom, or usage, of any State or Territory, subjects, or causes to be subjected, any citizen of the United States or other person within the jurisdiction thereof to the *deprivation of any rights, privileges, or immunities secured by the Constitution and laws,* shall be liable to the party injured in an action at law, suit in equity, or other proper proceeding for redress." 42 U.S.C. § 1983 (emphasis added).

■ It is well established that the placement of an inmate in maximum security confinement does not per se constitute cruel and unusual punishment. Courtney v. Bishop, 409 F.2d 1185, 1187 (8th Cir. 1969); Jackson v. Bishop, 404 F.2d 571 (8th Cir. 1968). A review of the cases, however, demonstrates that just what constitutes cruel and unusual punishment in the constitutional sense is difficult to specifically define.

■ In *Hancock v. Avery*, 301 F.Supp. 786 (M.D.Tenn.1969) the Court, in its attempt to supply a definition, recognized that the concept of cruel and unusual punishment has wide application and is capable of acquiring new meaning to conform to enlightened concepts of criminal justice. Citing: Weems v. United States, 217 U.S. 349, 30 S.Ct. 544, 54 L.Ed. 793 (1910). It is possible to identify three general approaches to defining this concept. The first approach is to ask whether under all the circumstances the punishment in question is "of such character * * * as to shock general conscience or to be intolerable in fundamental fairness." Lee v. Tahash, 352 F.2d 970, 972 (8th Cir. 1965). Such a judgment is to be made in light of "developing concepts of decency". Weems v. United States, *supra*, 217 U.S. at page 378, 30 S.Ct. 544; Jordan v. Fitzharris,

257 F.Supp. 674, 679 (N.D.Cal.1966). Secondly, a punishment may be cruel and unusual if it is greatly disproportionate to the offenses for which it is imposed. Weems v. United States, *supra*; Robinson v. California, *supra*, 370 U.S. at page 676, 82 S.Ct. 1417. Finally, a punishment may be cruel and unusual when, although applied in pursuit of a legitimate penal aim, it goes beyond what is necessary to achieve that aim; that is, when a punishment is unnecessarily cruel in view of the purpose for which it is used. Weems v. United States, *supra*, 217 U.S. at page 370, 30 S.Ct. 544; see: Wright v. McMann, 387 F.2d 519 (2nd Cir. 1967). These principles and standards, articulated in *Jackson, supra*, were reiterated and summarized in *Sharp v. Sigler*, 408 F.2d 966 (8th Cir. 1969) and made applicable to all cases involving alleged violations of federally protected constitutional rights.

For the purposes of this opinion, the issues concerning Beishir's second ground for relief, will be considered first. The issues raised in the second stage of the trial: i. e. plaintiff's first, third and fourth grounds for equitable relief, will be treated last with such pertinent additional findings of fact as needed.

## CLAIM OF CRUEL AND UNUSUAL PUNISHMENT THROUGH PUNITIVE CONFINEMENT, HOSING AND MACING IN JUNE 1969

■ Plaintiff Beishir seeks to recover both compensatory and punitive damages from defendant Swenson for his confinement from June 27–29, 1969, in a maximum security seclusion cell. In addition, plaintiff seeks compensatory and punitive damages from defendants Swenson, Wyrick, Steele, Hill, Stewart and Borghardt, growing out of the hosing and macing incident of June 29, 1969. However, it is the finding and judgment of the Court that plaintiff Beishir has failed to sustain his burden of proof of persuading the Court by a preponderance of the credible evidence that he was deprived of a right, privilege or im-

munity secured by the "Constitution and Laws".

An application of the announced standards clearly indicates plaintiff was not subjected to cruel and unusual punishment. This conclusion is reached irrespective of which of the prior discussed tests is applied. Certainly the placement of plaintiff in a seclusion cell and exposure to chemical mace, after all lesser methods to regain control failed, does not constitute punishment of such character as to shock the conscience or be intolerable to fundamental fairness. Nor is this a case where a prisoner has been subjected to physical and mental abuse or corporal punishment disproportionate to the offense for which it was imposed. Likewise, it cannot be said that the defendants, in pursuit of a legitimate penal purpose, namely, to prevent spread of inmate rebellion and to restore order, used force beyond what was necessary to achieve that vital purpose.

In the light of these tests there is no evidence to indicate the defendants' action was arbitrary, capricious or unreasonable. Confronted with riotous conduct likely to cause repercussions throughout the institution and after three days of flooding, burning and destruction of property, Warden Swenson and his staff identified the agitators and formulated a plan to segregate them from the other inmates. The agitators were searched and removed without the use of force and placed in seclusion cells with adequate clothing. The nutritional and hygienic needs of the inmates were satisfied during their confinement in the seclusion cells. It is not unreasonable, in a constitutional sense, to cause several persons to share the same cell for a short period of time in an emergency situation while attempting to make arrangements for additional space.

Neither can it be said to be unreasonable to resort to the judicious use of mace to regain control and establish order after lesser means have failed. When the use of a fire hose failed to re-store order it was no abuse of discretion or constitutional deprivation to advance to the next most severe nonlethal remedy. Hence, it is the Court's finding that there is no merit to plaintiff's contention made as a part of his second ground for relief.

FINDINGS OF FACT AND CONCLUSIONS OF LAW CONCERNING PLAINTIFF'S FIRST, THIRD, AND FOURTH GROUNDS FOR EQUITABLE RELIEF

Having in mind the equitable issues raised in plaintiff Beishir's first, third, and fourth grounds for relief, the Court from all the evidence finds these additional facts:

At the Missouri State Penitentiary, there is an Adjustment Board which is composed of three officers or employees of the Penitentiary which hears cases involving inmate conduct violations. If an inmate commits an act which is in violation of a prison regulation, an inmate violation report is prepared by the reporting officer, and thereupon the offending inmate is interviewed by another officer and is advised of the nature of his alleged conduct violation. The interviewing officer obtains any statement the inmate may wish to make. If the offense is substantial in the judgment of the interviewing officer, the matter is brought before an Adjustment Board. The inmate appears before the Adjustment Board and has an opportunity to make any statement that he desires and the Adjustment Board renders its decision. The Adjustment Board may confine an inmate to a punitive segregation unit for not more than ten days, pursuant to Missouri statute.[8] The Adjustment Board may not commit an inmate to maximum security. The decisions of the Adjustment Board are reviewed by the Associate Warden and then by the Warden.

The question as to whether an inmate at the Missouri State Penitentiary shall be assigned to maximum security is de-

---

8. See: Vernon's Annotated Missouri Statutes, Section 216.455.

termined by the Classification Committee. This committee is composed of one of the associate wardens, either of custody or treatment, and three other individuals, none of whom are the investigating officer nor the observing officer. The Classification Committee reviews the inmate's file and his alleged conduct violation and determines if there is a violation, and whether it is necessary in its judgment to recommend that the inmate be assigned to maximum security for his conduct violation. The decision and recommendation of the Classification Committee is in turn reviewed by the Warden, who is the one authorized to order the commitment to maximum security. If an assignment is made to maximum security, a review date of not more than six months from the date of the decision is set, and within that time plaintiff's status in maximum security is reviewed. If an inmate has been maintained in the maximum security unit for twelve months, the Warden of the Missouri State Penitentiary reviews the file and the inmate personally appears before the Warden to discuss his status.

Within the confines of the Missouri State Penitentiary for Men at Jefferson City, Missouri, there are several forms of inmate status:

(a) An honor dormitory status in which inmates who are to be shortly released are housed in an honor dormitory.

(b) General population status. This is the main population status and it has two sub-sections, (1) minimum security segregation, and (2) maximum security segregation. Among the privileges provided those in general population status are the following: clothing—and a change of clothing twice a week; shave and shower each day; a change of sheets weekly; allowances of certain items of personal furniture; access to a library and the daily delivery of magazines, newspapers and other reading materials; daily yard privileges and recreational privileges; and the opportunity to attend movies weekly. Also, inmates in general population status are allowed to go to a common mess hall and to associate with one another in the yards and cells; may be assigned to work assignments within the division of prison industries and are paid a salary for such work; are allowed to spend $25 a month at the commissary and purchase any item sold there; are allowed to earn three-fourths time under the Missouri statute [9] and institutional merit time of 15 days a month for a good conduct record.[10] Additionally, inmates in general population status may attend academic classes, may take correspondence courses, and are allowed to purchase a television, radio and a fan for their cell.

Minimum security segregation is for inmates in violation of certain institutional rules. In such a status the inmate is denied the rights and privileges of general population status for a period no longer than ten days.

Special treatment unit status is an intermediate unit between those inmates in maximum security and the general population. The privileges allowed the inmates in this status include: the opportunity to go to a special mess hall maintained in the special treatment dormitory; the right to earn five days merit time a month; the availability of correspondence courses; the same privileges as to outside visitors as those inmates in general population; the same mail privileges as general population; the same privileges regarding canteen expenditures as general population; and the same privileges in regard to the purchase of personal radios.

There is also at the Missouri State Penitentiary for Men at Jefferson City, Missouri, as in all penitentiaries, a maximum security status. Of necessity, privi-

---

8. See: Vernon's Annotated Missouri Statutes, Section 216.355.

9. Provided for in the Inmate Informational Pamphlet, Rules and Procedures, Revised January, 1970, Promulgated under V.A.M.S. § 216.405.

leges granted to the inmates on maximum security status are not the same as those granted other inmates. Their privileges include: the provision of clothes and a change of clothes twice a week; showers and shaves twice a week; a visit by the penitentiary doctor once a week; a daily visit by an orderly; admission to the hospital as necessary; and tobacco, lighter and lighter fluid provided by the State. They are permitted daily delivery of magazines, newspapers and other reading materials, and have access to a rotating library of 400 to 600 books from which they may choose two books a week and may exchange these two books as read with other inmates in the maximum security unit. Educational courses may be received while in maximum security; the mail privileges are the same as those of general population, visiting privileges are the same while assigned to maximum security as in general population, and the visiting privileges are the same even while assigned to the seclusion cells. Inmates in maximum security are given counselling sessions with inmate lawyers at their request. Inmates so confined may be given haircuts at their own request. An exercise yard is provided to be used by the inmates twice a week for a total of approximately an hour. Inmates confined in maximum security may purchase one half the amount of commissary items from the penitentiary canteen as those in general population. Inmates so confined are provided three meals a day and these are the same meals that are provided in general population. These meals are served to the inmates in their cells from a steam cart. Inmates assigned to maximum security may receive the same number of packages from their families as those in general population.

Plaintiff Beishir has on several occasions been confined in the maximum security detention unit of the Missouri State Penitentiary for Men at Jefferson City, Missouri. The reasons for those confinements and the periodic reviews he received, while not a part of the claim he makes before this Court in equity, are to some extent relevant to one or more of the issues: On May 22, 1969, plaintiff was placed in the maximum security unit pending action by the Classification Committee on the report of two inmates that Beishir had threatened to assault them in connection with a loan racket. On May 29, 1969, the issue of his confinement was considered by the Classification Committee. The committee on that occasion was composed of Mr. Schulte, Lt. Whitworth, Rev. H. M. Larsen, Mr. Delbert Smith, Mr. Vestal and Mr. T. P. Lock. A pass was sent to Beishir so that he might appear before the committee. He refused the pass. The committee, based upon the information before it in the form of investigation reports, voted to place Beishir on maximum security status for the purpose of control and discipline and set a review date of November 29, 1969. On May 29, 1969, written notice was given to Beishir that the Classification Committee had decided to place him on maximum security status, and the written notice stated the reason.

On November 25, 1969, the question of Beishir's assignment to maximum security was reviewed by the Classification Committee. The committee on this occasion was composed of Capt. Troyer, Capt. Steele, Mr. Cloval Vestal and Mr. T. P. Lock. Plaintiff Beishir personally appeared before the Classification Committee on this occasion and, based upon the information before it the committee decided to retain Beishir in maximum security and a review date of April 25, 1970, was established for reexamination of plaintiff's case. Immediate written notice was given to plaintiff that the Classification Committee had voted to retain him on maximum security status and he was advised of the reasons and of the April, 1970 review date.

On April 28, 1970, plaintiff Beishir's assignment to maximum security was again reviewed by the Classification Committee. On that occasion, the committee was composed of Associate Warden Wyrick, Capt. Tucker, Lt. Williams, Mr. Delbert Smith and Mr. T. P. Lock.

Plaintiff Beishir personally appeared before the committee. On April 28, 1970, written notice was given to him that "After carefully reviewing your file and talking with you, it was voted by the Classification Committee that you remain on your present status." Plaintiff was also informed his case would be reviewed in October, 1970.

On October 27, 1970, plaintiff Beishir's assignment to maximum security was again reviewed by the Classification Committee. The committee on this occasion was composed of Mr. Wyrick, Capt. Tucker, Mr. Cloval Vestal, Mr. Delbert Smith and Mr. T. P. Lock. Plaintiff Beishir personally appeared before the committee on this occasion, and, after a review of the report before the committee, it was the decision of the committee that plaintiff be retained on maximum security status and a review date of April 27, 1971, was established. On October 27, 1970, written notice was given to plaintiff that it was the decision of the Classification Committee that he should be retained in maximum security for the purpose of control and advised him that his case would be reviewed in April of 1971.

### CONTENTION CONCERNING LACK OF DUE PROCESS

■ Plaintiff Beishir alleges that the administrative procedure under which he was placed in maximum security, with a resulting loss of good time, allegedly deprived him of liberty and property without due process of law. The 8th Circuit Court of Appeals in *Burns v. Swenson*, 430 F.2d 771, at page 779, stated:

> "The Constitution does not require that every inmate must in every instance be given a formal hearing prior to segregation in maximum security. This course of procedure, although desirable, is not always practical. The exigencies of unusual or emergency situations dictate that an inmate be unilaterally segregated first, with a hearing provided later."

The procedures followed by the Department of Corrections and Missouri State Penitentiary for Men at Jefferson City, Missouri, promulgated under the administration of Director Fred T. Wilkinson and Warden Harold R. Swenson in non-exigent circumstances were considered in *Burns v. Swenson*, 430 F.2d 771, 780 (8th Cir. 1970); and as applied in the particular case, were found to be fair and clearly above any present legally defined minimally acceptable criteria for due process. See also the recent decision in *Sostre v. McGinnis*, 442 F.2d 178 (2nd Cir. 1971).

It is not necessary to restate the circumstances of Beishir's original confinement in maximum security and the reasons therefor. The described official reviews of his conduct and the proceedings before the Classification Committee and Adjustment Board amply satisfy the requirements of due process as presently defined. On each occasion Beishir was notified and given the opportunity to appear personally before the Classification Committee. He was made aware of the charges being made against him, had the opportunity to speak on his behalf and present his position to an impartial group of high-ranking administrative personnel. On each occasion he was given written notice of the committee's decision, their reasons and a future date for review. The procedure itself, and as applied to him was fundamentally fair, and was sufficient under all the attendant circumstances to accord him constitutional due process. See, for example, McKeiver v. Pennsylvania, 403 U.S. 528, 91 S.Ct. 1976, 29 L.Ed.2d 647 (1971).

### CONTENTION CONCERNING INDEFINITE CONFINEMENT IN MAXIMUM SECURITY

■ Plaintiff Beishir alleges his eighth amendment rights have been violated through indefinite and extended confinement in maximum security. Indefinite confinement in maximum security is not per se violative of the eighth amendment. Rather, such confinement must be examined in light of the principles articulated in *Lee, Weems, Jordan,*

*Robinson* and *Jackson, supra.* In *Sostre v. McGinnis, supra,* the Court examined the situation of incarceration in segregated cells for an indefinite period and stated, loc. cit. at page 192:

"In several states, however, incarceration in segregated cells seems to be for an indefinite period, as it is in New York. [Mo.Rev.Stat. § 216.405 (sic 216.455), cited in Burns v. Swenson, 430 F.2d 771 (8th Cir. 1970); statutes cited American Law Institute, Model Penal Code § 306.7.6 n. 13 (Tent. Draft No. 12, 1960)]. The federal practice appears to be that prisoners shall be retained in solitary 'for as long as necessary to achieve the purposes intended,' sometimes 'indefinitely.' * * * Such analogous practices [22] do not compel us to the conclusion that the Eighth Amendment forbids indefinite confinement under the conditions endured by Sostre * * *."

"22. The Supreme Court has struck down a choice of punishment only when the penalty was authorized in almost no other civilized jurisdiction. Trop v. Dulles, 356 U.S. 86, 78 S.Ct. 590, 2 L.Ed.2d 630 (1958); Weems v. United States, 217 U.S. 349, 30 S.Ct. 544, 54 L.Ed. 793 (1910), or conflicted with moral precepts 'universally held,' Robinson v. California, 370 U.S. 660, 82 S.Ct. 1417, 8 L.Ed.2d 758 (1962). See also Jackson v. Bishop, 404 F.2d 571, 580 (8th Cir. 1968), (Use of strap permitted in only two states, outlawed in several)." 442 F.2d p. 192.

The retention of Beishir for an unlimited period of time with a periodic review of his classification by the Classification Committee in accordance with the mentioned regulations of the institution does not constitute cruel and unusual punishment. Considered in their entirety, the conditions of Beishir's confinement are reasonably related to the security requirements of the institution. Beishir's prison *classification is* a function of the executive branch of government. The wide discretion with which state prison officials are vested in the administration of the prison, as noted in

*Douglas v. Sigler,* 386 F.2d 684 (8th Cir. 1967), will not be interfered with absent an infringement upon a constitutional right. See also, *Sharp, Jackson, Burns, Howard, Haines, supra.* Such an infringement is not present in Beishir's case. See also, Holt v. Sarver, 442 F.2d 304 (8th Cir. 1971).

## CONTENTION CONCERNING DISPROPORTIONATE PUNISHMENT

Beishir's final claim for equitable relief is premised on the standards announced in *Weems* and *Robinson, supra,* alleging that his continued confinement in maximum security *and* the imposition of sanctions for rule infractions, constitutes double punishment. It is plaintiff's unsupported position that such "double" punishment is cruel and unusual because it is allegedly greatly disproportionate to the offenses for which it is imposed. See *Robinson v. California, supra,* 370 U.S. at page 676, 82 S.Ct. 1417, for the Court's statement of this test. Beishir's classification file establishes adequate reason for his maximum security status. All of his reports indicate that he has evidenced no inclination toward rehabilitation. To impose sanctions on Beishir of the same nature as those administered to general population inmates, for continued rule infractions, does not constitute cruel and unusual punishment under the "punishment greatly disproportionate" test. Under the circumstances of Beishir's case there is no deprivation of a constitutional right and no grounds for judicial intervention into the prison's internal discipline. See: *Sharp, Jackson, Courtney, Howard, supra,* and Burns v. Swenson, 430 F.2d 771, pp. 775–776, 780 (8th Cir. 1970).

In conclusion, after application of the above mentioned and judicially approved standards to the particular circumstances of Beishir's case, the undersigned Court finds that plaintiff Beishir has not suffered any deprivation of a right, privilege or immunity secured by the Constitution and law of the United States.

Accordingly, it is hereby

Ordered and adjudged that plaintiff Beishir's claims for money damages are without merit and that he is not entitled to recover anything from the defendants on the issues raised by his second ground for relief, and

It is further ordered and adjudged that plaintiff Beishir's claims for equitable relief are without merit and are hereby denied. Defendants are entitled to and are granted judgment on all issues.