James L. **GREEAR**, Petitioner,

v.

W. R. **LOVING**, Superintendent, Respondent.

Civ. A. No. 74–C–112–H.

United States District Court,
W. D. Virginia,
Harrisonburg Division.

April 8, 1975.

Stuart Bateman, Asst. Atty. Gen., Richmond, Va., for respondent.

## OPINION and JUDGMENT

DALTON, District Judge.

James L. Greear, an inmate at Correctional Unit #10, Greenville, Virginia, has filed a *pro se* complaint alleging that he has suffered cruel and unusual punishment at the hands of the correctional officials of Unit #10. The court allowed the complaint to be filed *in forma pauperis* by an order dated December 4, 1974. The complaint was filed as an action arising under 42 U.S.C. § 1983; jurisdiction vests in the court pursuant to 28 U.S.C. § 1343.

Petitioner alleges that he was teargassed while in his cell on or about October 23, 1974, and that he has also been denied proper medical treatment. Specifically, petitioner alleges that on the night of October 23, 1974, correctional officers "did wilfully and maliciously fire, at point blank range, a tear gas device in the plaintiff's face, and further that after having discharged this tear gas in plaintiff's face, the defendant caused the plaintiff to be held in a

closed space . . . for a period of approximately 11 hours." In his complaint petitioner admits that he "was agitated and highly emotional" and that earlier in the day it had taken "five (5) correctional officers to subdue and handcuff the plaintiff."

As to petitioner's allegation concerning the denial of medical treatment, petitioner specifically alleges that "he has only on limited occasions seen even a doctor of medicine and has never been afforded an opportunity to see a psychiatrist to determine if anything can be done to help his emotional state."

Respondent filed a motion for summary judgment attaching his own affidavit, a copy of a report from the Superintendent of Unit #25 (where petitioner had been previously detained) authorizing petitioner's transfer from Unit #25 to Unit #10 the same day as the gassing, a copy of the Unit #10 log book indicating when the petitioner was given his medicine, and a copy of petitioner's medical record card.

In his affidavit respondent describes in detail the events which transpired the day of October 23, 1974. At approximately 2:00 a. m. on October 23, 1974, petitioner was transferred for security reasons to Unit #10 from Unit #25 at the direction of the Superintendent of Unit #25. In his report authorizing the transfer, the Superintendent of Unit #25 includes a description of petitioner's behavior which resulted in the transfer order. The description contains references to petitioner's destruction of property and the necessity for five (5) correctional officers to finally subdue and handcuff petitioner. Upon arriving at Unit #10 petitioner was placed in an isolation cell as he was deemed a security risk. At approximately 9:30 p. m. petitioner began to destroy the contents of his isolation cell. Efforts by the night officers to calm petitioner down failed and petitioner set fire to his mattress and bedclothing. Correctional officials then used a water hose to extinguish the fire, whereupon

petitioner "continued to destroy his cell by breaking out the cell windows, knocking a hole in the bottom of his sink, and tearing out the plumbing in his cell." Petitioner then "tore a bedpost from his bed and began thrashing everything in his cell." After repeated warnings that gas might be used, the correctional officer fired a twelve gauge tear gas shell into the petitioner's cell. Respondent further states that he did not move the petitioner from his cell after the gassing because the petitioner had been so agitated that the move could not be made safely. He did cause the windows in the isolation area to be opened to that a draft would be created to clear the gas from the petitioner's cell where petitioner's window had already been broken. At approximately noon on October 24, 1974, respondent ordered petitioner moved to another isolation cell and gave him a bowl of warm water and a wash cloth.

Respondent further avers that petitioner did request to see a doctor upon his arrival at Unit #10, but as petitioner arrived in the middle of the night, respondent told petitioner that he would have to wait until the earliest available opportunity. The first day the unit's physician was available was October 28, 1974, at which time petitioner was examined, and the doctor prescribed tranquilizers. Finally respondent avers that he received no request by petitioner for psychiatric evaluation.

The court after a preliminary consideration of the pleadings in the case and because of the serious nature of petitioner's allegations requested that petitioner be given a psychiatric evaluation. On January 10, 1975, petitioner was sent to the Virginia State Penitentiary in Richmond, Virginia, for psychiatric evaluation and consultation. The chief psychologist of the Virginia State Penitentiary, William C. Perdue, has filed an affidavit and attached a copy of a consultation report by John Mullaney, M.D., a psychiatrist. On January 21, 1975, Dr. Mullaney held a consultation with

petitioner and found that petitioner "demonstrates no pathology in his mental status today. His recent and past history tend to indicate some emotional instability, immaturity, and impulsivity but these do not seem to be generally of pronounced proportions." He concluded that "there seems to be no need for any further immediate treatment effort and Mr. Greear agreed with this." The petitioner was held at the penitentiary for an additional thirty days so that the psychiatric report could be received and evaluated and so that petitioner could be further observed for any untoward behavior. On February 21, 1975, petitioner was returned to Unit #10 as petitioner appeared to have adjusted properly.

 The court emphasizes the close scrutiny with which it considers the use of tear gas in correctional facilities. In Landman v. Royster, 333 F.Supp. 621 (E.D.Va.1971) Judge Merhige stated that "[t]he use of [tear] gas to disable a man physically who poses no present physical threat constitutes a form of corporal punishment, the use in such a situation is generally disapproved." Id. at 649. This court agrees with Judge Merhige's view of the use of tear gas, but notes that the use of tear gas is not forbidden in all instances but only when there appears to be no necessity for its use. After evaluating the lengthy documents in this case and considering the petitioner's conduct on the day in issue, the court holds that the respondent's use of tear gas was a proper security action. Petitioner had required five (5) correctional officers to subdue him; he was on a destructive rampage; and with reason the correctional officers feared for his and their safety. Thus the court holds that the use of tear gas in this factual setting did not constitute cruel and unusual punishment.

Petitioner's second allegation concerning medical treatment is without merit. The court finds that reasonable medical care was afforded petitioner, especially considering the recent psychi-

atric care provided to him. The fact that petitioner was not taken to a physician immediately after so requesting does not create a denial of proper medical care. As there was no emergency or other exigent circumstances, there was no need for immediate action on the part of the correctional officials. The psychiatric consultation served to eradicate any lingering doubt as to whether petitioner had been provided with proper medical treatment.

For the above reasons, the court grants respondent's motion for summary judgment and accordingly orders petitioner's complaint dismissed and stricken from the docket. Petitioner is advised that he may appeal the judgment of this court by filing a notice of appeal with the clerk of this court within thirty (30) days.