Thomas McCARGO et al.

v.

Theodore MISTER.

Civ. No. Y–77–999.

United States District Court, D. Maryland.

Dec. 19, 1978.

Thomas McCargo and George Thomas, pro se.

Stephen Rosenbaum, Asst. Atty. Gen., Baltimore, Md., for defendant.

## MEMORANDUM AND ORDER

JOSEPH H. YOUNG, District Judge.

### I. FACTS

On August 20, 1976, at approximately 8:15 p. m., Officer Theodore Mister was on duty in the Maryland Penitentiary. While dispensing medication on the fourth floor in the segregation section of "C" Dormitory, Mister was stopped by inmate Thomas who was sharing a cell in segregation with the other named plaintiff in this action, Thomas McCargo. Inmate Thomas asked why Mister had confiscated his mirror earlier that evening, and Mister replied that a mirror was contraband material in the part of the prison where Thomas was located. According to the Adjustment Report filed by Officer Mister, Thomas then began yelling obscenities at him, threatening to take Mister's life if he did not return the mirror. Next, Thomas reportedly reached through the bars of his cell and grabbed Mister by his shirt and began beating his head against the cell door seven or eight times. Mister alleges that Thomas also spit into his face twice. In the meantime, Mister called down to the first tier or ground floor to Officer Bouldin for help. As Bouldin came

running to his assistance, Mister broke free of Thomas, and, believing that Thomas had grabbed some sort of "pointed weapon" from under his bunk, grabbed Officer Bouldin's tear gas cannister from his hand and "shot it into the cell to protect myself from any further attacks or injuries." (Adjustment Report of Mister, p. 2). Officer Bouldin's Adjustment Report makes no mention of Thomas beating Mister's head against the bars, except to report that "[l]ater Officer Mister explained to me that inmate George Thomas # 133–164 had pinned him against the cell door and banged his head and spit in his face." (Adjustment Report of Bouldin).

Plaintiffs Thomas and McCargo filed a pro se complaint pursuant to 42 U.S.C. § 1983 in which they asserted that Officer Mister's actions had been in violation of the Eighth Amendment of the United States Constitution and the Due Process Clause of the Fourteenth Amendment. Plaintiffs alleged further that the spraying of "crop duster gas" into their cell damaged beyond salvage their personal property consisting of family pictures, letters, books and clothing. Plaintiff Thomas also noted in his complaint that on September 26, 1976, the Maryland Inmate Grievance Committee had found his grievance against Officer Mister to be meritorious. Plaintiffs were given leave by this Court to proceed with their complaint in forma pauperis.

Defendant responded with a motion to dismiss, or, in the alternative, a motion for summary judgment, stating, inter alia, that there were no disputes between the parties as to any material facts. After being informed of defendant's motion, plaintiff McCargo submitted an affidavit, dated July 19, 1978, in which he swore that "without any legitimate reason Defendant Mister called down the stairs to the desk requesting assistance." Plaintiff McCargo also makes no mention of anyone beating Officer Mister, noting that "absent any warranted provocation Defendant Mister started shouting profanity at Plaintiff Thomas concerning the mirror and also indignantly asked Plaintiff Thomas as to whether he's a

brother of Calvin Thomas (a [sic] inmate) who only a month prior been assaulted by Defendant Mister."

On July 1, 1978, defendant Mister submitted an affidavit stating that plaintiffs' personal property was not damaged because of the alleged incident and that he followed standard procedures in transferring plaintiffs for showering and treatment shortly after having been sprayed with the tear gas. Defendant's affidavit makes no mention of having been beaten against the cell bars by plaintiff Thomas on the evening in question.

Defendant has also submitted an affidavit by Forrest Calhoun, Jr., Associate Director, Superintendent of Patuxent Institution, to the effect that plaintiff Thomas' file does not reflect that he was hospitalized for four days after the August 20 incident.

With reference to plaintiffs' grievance filed with the Inmate Grievance Commission, the Commission found that

Officer Thomas Mister violated DCR 115–2 and DCR 50–2.4(1) in that his testimpny [sic] and other evidence disclosed that he was not being assaulted and was not in danger of being assaulted by inmate Thomas or McCargo (both of whom were locked in their cell) and that he could have followed the reasonable non-forceful solution of walking away from the cell, instead of using the crop duster gas.

Commission Findings at 3. These findings were later affirmed by the Secretary of the Division of Correction with a recommendation that the Division take appropriate disciplinary action against Mister, who was later reprimanded. See Letter from Commissioner Levine to Warden Collins on December 1, 1976. In light of the factual discrepancies apparent between the plaintiffs' version of this episode and that of Officer Mister, defendant's motion for summary judgment or dismissal was denied, and an evidentiary hearing was held on November 24, 1978.

## II. USE OF TEAR GAS AGAINST PRISONERS IN THEIR CELL

At issue in this case is whether or not Officer Mister's use of tear gas against plaintiffs who were indisputably locked behind the bars of their cell constitutes cruel and unusual punishment unlawful under the terms of the Eighth Amendment. In his motion to dismiss, defendant stated that the use of the tear gas was authorized by Division of Correction Regulation ("DCR") 115–2 which reads in pertinent part as follows:

4. Policy and Procedure:

a. The main goal of the Division of Correction is rehabilitation; therefore, the use of force is to be resorted to only after all reasonable non-forceful solutions have failed.

b. Unfortunately, there will be occasions when it may be necessary to use force to control an inmate. Those situations in which force may be used on an inmate are:

(1) In self-defense from an assault by an inmate

(2) In defense of third parties, such as another employee, another inmate, or a visitor

(3) To enforce institutional directives or rules when an inmate refuses to obey such rules and non-forceful methods have failed

(4) To prevent a commission of a crime, such as malicious destruction of State property or an institutional riot

(5) To prevent escape.

c. When it is necessary to use force, the rule is that only "reasonable" force will be used. The facts in each case will determine if the force was excessive and will be determined on the following elements:

(1) Belief, based on observation of behavior and general appearance, that an inmate has a weapon

(2) Belief by the Correctional Officer, based on observation of behavior and general appearance, that he or a third person is in danger of death or serious bodily harm.

(3) The means of force available to the Correctional Officer.

Defendant's use of tear gas was premised upon his belief that Thomas was reaching for a weapon and *not* upon the alleged fact that Thomas had beaten his head against the bars. Under DCR 115–2, only "reasonable" force is permitted in light of an officer's "[b]elief, based on observation of behavior and general appearance, that an inmate has a weapon." Officer Mister's sworn affidavit did not speak to his actual belief at the time he sprayed the tear gas into plaintiffs' cell, although at the hearing he stated that he was, in fact, very much in fear for his life at that time.[1] The findings of the Inmate Grievance Commission, however, challenge Officer Mister's claims and suggest that he could have walked away from the cell had he feared that Thomas indeed had a weapon.

Additionally, with reference to Officer Mister's claims that he suffered injuries as a result of the August 20 incident, the findings of the Inmate Grievance Commission indicate that Officer Mister's physical impairment may not have resulted solely from actions taken by plaintiff that evening:

> Officer Mister stated that he passed out that evening and later went to the hospital where he was treated for a cerebral concussion, but he did not know if it was the same concussion he had on July 2, 1976, or if it was a new concussion resulting from the incident of August 20, 1976.

Commission Findings at 2. A Supplemental Award of Compensation, Subsequent Injury Fund, by the Maryland Workmen's Compensation Commission further corroborates the finding that Officer Mister's disabilities in part predated the August 20, 1976 incident.

Given the inconclusiveness of the record on this point, the Court wrote to the Attorney General's Office on August 24, 1978 requesting additional information which might shed some light on this matter. Specifically, the Court directed the Attorney General to address two issues: (1) the basis for concluding that plaintiff Thomas assaulted Officer Mister, especially in light of the findings by the Maryland Inmate Grievance Commission that no assault took place, and (2) the degree to which Officer Mister's injuries were the cumulative effect of prior prison incidents.

Responding to the first inquiry, the Attorney General's Office said that the finding of the Inmate Grievance Commission was "not a finding that defendant was not assaulted prior to the use of the tear gas, but rather a finding that defendant used unreasonable force in retaliation." Letter to the Court from Stephen Rosenbaum, Assistant Attorney General, August 31, 1978. The Court fails to see how this conclusion follows, especially in light of the wording used by the Inmate Grievance Commission that Officer Mister's testimony and other evidence "disclosed that *he was not being assaulted* and *was not in danger of being assaulted. . . .*" The Attorney General's interpretation of the Inmate Grievance Commission's findings fails to comport with the plain meaning of the report.

As to the cumulativeness of Officer Mister's injuries, the data submitted by the Attorney General proves to be inconclusive. The doctors' reports and other records submitted do, however, demonstrate that Officer Mister has a fairly lengthy history of neurological problems. In 1970 and 1971 he was evaluated for seizures, and although nothing was found, his doctor in 1977 concluded that he may have suffered a "psychomotor seizure" although no date for the occurrence of this seizure was indicated. Officer Mister joined the Navy shortly after graduation from high school and was in the service for about two months before receiving a medical discharge due to a history of episodes of loss of consciousness dating back to 1970. On January 19, 1971, he suffered a

---

1. At the evidentiary hearing, Officer John Heiss who was on duty at the Maryland Penitentiary on the evening of August 20, 1976 testified that earlier in the day four correctional officers had been injured during an incident with several inmates. Officer Mister testified that he was apprised of this incident when he went on duty, and the knowledge of the fact that some of the officers had been seriously injured appeared to be very much on his mind that evening.

head injury with multiple lacerations of the face and a cerebral concussion as a result of an automobile accident. His doctors' reports also indicate that as a result of a July 2, 1976 assault in the Maryland Penitentiary, he suffered further headaches and periods of dizziness. The dizziness and headaches continued after the alleged assault of August 20, 1976; however, as the record currently stands, this Court has no basis for concluding that the injuries of which Officer Mister complains were the direct result of any assault by plaintiffs in this case. While such an assault, if it did occur, would no doubt have aggravated any pre-existing conditions, this Court cannot take the additional step of concluding that Officer Mister's medical records demonstrate conclusively that he was assaulted on August 20, 1976.

As Chief Judge Northrop stated in *McCray v. Burrell*, 367 F.Supp. 1191 (D.Md. 1973),[2] the Inmate Grievance Commission combines two valuable innovations: "initial investigation by a non-judicial institution charged 'with the responsibility of investigating and assessing prisoner complaints, and provision for subsequent review by the courts." 367 F.Supp. at 1207. The Maryland General Assembly enacted section 204F of article 41 of the Maryland Code which establishes the Maryland Inmate Grievance Commission. Md.Ann.Code art. 41, § 204F (Supp.1975). In creating such a commission, Maryland became the first state in the country to provide a quasi-judicial proceeding for hearing inmate grievances. *See* Tibbles, *Ombudsmen for American Prisons*, 48 N.D.L.Rev. 383, 418 (1972), and Comment, *The Maryland Inmate Grievance Commission or the Federal Courts? A Problem of Exhaustion*, 35 Md.L.Rev. 458

(1976). The Commission was established with the encouragement of Chief Justice Burger, the Governor's Office, and the Attorney General of Maryland, and was intended to provide a forum for impartial determination of prisoner complaints by a panel having both legal experience (two of the five members must be attorneys) and knowledge and experience in on one or more fields within the jurisdiction of the Department of Public Safety and Correctional Services. Comment, *supra* at 460–61. If this state system for remedying inmate grievances is to have any effectiveness or continued viability serving as a model, perhaps, for other states, then this Court should accord the Commission's findings serious attention. *See* Hufstedler, *A Proposal for Inmate Institutions Commissions*, 64 A.B.A.J. 356 (1978).

■ According to the findings of the Inmate Grievance Commission, Officer Mister was not being attacked by Inmate Thomas, and Officer Mister did not state otherwise in his sworn affidavit. At the hearing, Officer Bouldin testified that he was close enough to plaintiffs' cell to have seen what occurred, and he did not see either plaintiff grab Officer Mister. Furthermore, he saw no bruises on Officer Mister or other indications that there had been a struggle. Plaintiffs also called as witnesses Clifton Fitzgerald and Vernon Buttler both of whom were inmates at the Maryland Penitentiary on August 20, 1976. At the time of the alleged assault against Officer Mister, Fitzgerald and Buttler occupied adjoining cells in the segregation unit, and both witnesses testified that they neither heard nor saw any alleged assault against Officer Mister.[3] The only testimony as to the occurrence of the assault came from Officer Mister him-

---

2. *McCray* was later reversed by the Fourth Circuit which held that inmates were not required to exhaust their remedies under the Maryland Inmate Grievance Commission before they could sue under 42 U.S.C. § 1983 for either injunctive relief or damages. 516 F.2d 357 (4th Cir. 1975).

3. Plaintiffs occupied cell number 404. Fitzgerald was in cell number 406, just two cells down from plaintiffs'. At the hearing, Fitzgerald tes-

tified that by use of a mirror positioned between the bars of his cell, he could see laterally up and down the tier. He stated that he saw no arms protruding from cell 404 and no one being grabbed by inmates McCargo and Thomas. Buttler lived in cell number 403, immediately adjacent to plaintiffs'. He saw no evidence of any assault and added that when Mister sprayed the gas into cell 404, it was so thick that you could "cut it."

self. While it is clear that prison officials may sometimes have to resort to "the occasional use of a degree of intentional force" in the operation of a correctional facility, it is equally clear that

> [i]n determining whether the constitutional line has been crossed, a court must look to such factors as the need for the application of force, the relationship between the need and the amount of force that was used, the extent of injury inflicted, and whether force was applied in a good faith effort to maintain or restore discipline or maliciously and sadistically for the very purpose of causing harm.

*Johnson v. Glick*, 481 F.2d 1028, 1033 (2d Cir. 1973), *cert. denied*, 414 U.S. 1033, 94 S.Ct. 462, 38 L.Ed.2d 32 (1973).

Under the standards set forth in DCR 115–2, the "use of force is to be resorted to only after all reasonable non-forceful solutions have failed." Likewise, whenever force is resorted to, only "reasonable" force may be used, and such force will be assessed in light of the facts and, inter alia, an officer's "[b]elief, based on observation of behavior and general appearance, that an inmate has a weapon." DCR 115–2. Consequently, Officer Mister's belief that plaintiff Thomas possessed a weapon depends on his assessment of Thomas' behavior, the principal aspects of which have been in question throughout these proceedings.

Aside from DCR 115–2, Maryland also has a DCR dealing specifically with the use of tear gas in penal institutions. To date, this DCR has not been referred to in the pleadings, but it was discussed at the hearing. DCR 110–10, promulgated on the same date as DCR 115–2, states that gas may be used "only when such force is required to quell a disturbance or protect the lives of inmates or employees. (See DCR 115–2)." Furthermore, only Managing Officers or the individual officially in command of the institution may authorize the use of tear gas. Finally, DCR 110–10 requires that "[o]nly those officers who have been trained in the use of gas or stun type weapons will be authorized to use such weapons." The facts, as they have been developed so far in this case, do not present a situation involving a disturbance which needed to be "quelled" or where human lives were clearly at stake. No Managing Officer or other individual "officially in command" of the prison authorized the use of the gas against Thomas. Although it appears that Officer Mister grabbed the gas from Officer Bouldin, there has been no evidence that Officer Mister was authorized to use tear gas, although he does relate that he has received instructions as to how to use it. Any assessment of Officer Mister's "belief" with regard to Thomas' dangerousness and the reasonableness of his reaction thereto, must be made in light of the guidelines for the use of gas in DCR 110–10. When considered together, DCRs 110–10 and 115–2 required that if he was permitted to use such gas in the first place, Officer Mister had to exercise force which was reasonable in relation to the severity of the threat which he faced.

■ The use of tear gas against inmates in their cells is not per se a cruel and unusual punishment. In the landmark case of *Landman v. Royster*, 333 F.Supp. 621 (E.D.Va.1971), Judge Merhige noted that "[t]ear gas has also been used to silence noisy, misbehaving men while confined to their cells;" however, in a situation where tear gas was used to punish or control a non-threatening inmate, the court concluded that such use was "generally disapproved." 333 F.Supp. at 649. Similarly, in *Greear v. Loving*, 391 F.Supp. 1269 (W.D. Va.1975), *vacated*, 538 F.2d 578 (4th Cir. 1976), the court remarked that "the use of tear gas is not forbidden in all instances but only when there appears to be no necessity for its use," and went on to "emphasize[] the close scrutiny with which it considers the use of tear gas in correctional facilities." 391 F.Supp. at 1271. The standard announced in *Spain v. Procunier*, 408 F.Supp. 534, 545 n.14 (N.D.Cal.1976), would apparently mandate an even stricter standard in comparison with that articulated by Judge Merhige in 1971:

> Tear gas and other chemical agents are dangerous, inflict pain, and can cause

permanent injury and even death. *They are corporal punishment, and absent clear and present dangers of riotous proportions, can never be justified when used against individual prisoners in their cells. The use of such chemicals in closed places . . . where the chemicals affect not only the target, but neighboring prisoners as well, imposes punishment upon prisoners who are innocent of even alleged wrongdoing and constitutes cruel and unusual punishment in violation of the Eighth and Fourteenth Amendments to the United States Constitution.* Landman v. Royster, 333 F.Supp. 621, (E.D.Va. 1971); *Battle v. Anderson,* 376 F.Supp. 402 (E.D.Okl.1974). (Emphasis added.) In light of the fact that the use of chemical agents such as tear gas and mace have as an "inherent characteristic the affecting of individuals other than those against whom they are specifically directed," *Battle v. Anderson,* 376 F.Supp. 402, 414 (E.D.Okl.1974), this Court holds that the use of such agents should be strictly limited to circumstances presenting the utmost degree of danger and loss of control. While recognizing that the use of such agents may occasionally be necessary to subdue or control inmates already confined within their cells, this Court concludes that such circumstances are, of necessity, rare.

Defendant directs the Court's attention to the holding in *Donahue v. Maynard,* 437 F.Supp. 47 (D.Kan.1977), where the use of mace against a prison inmate was found not to shock the conscience or constitute cruel and unusual punishment. In *Donahue,* however, the inmate stepped *out* of his cell, at which point a scuffle ensued, and the use of mace was a reasonable means of maintaining order, discipline, and security when faced with an "uncontrolled situation." 437 F.Supp. at 49. The instant case is readily distinguishable from *Donahue* in light of the fact that plaintiffs McCargo and Thomas were securely behind bars and could not create a serious disturbance.

Unless the Court carefully scrutinizes the use of tear gas against prisoners within their cells, a situation could result in which tear gas was used promiscuously and the officer could attempt to justify his action on his "good faith" belief that he saw the glint of a knife blade. Officer Heiss testified that during the week in which the incident involving plaintiffs took place, tear gas was used in the Maryland Penitentiary some three or four times.[4] The incentives should be structured against the free use of chemical agents within prison cells. Clearly Officer Mister's *belief* that Thomas possessed a weapon falls far short of the "riotous" conditions which the *Procunier* court required and which DCR 110–10 apparently envisions. As the *Battle* court noted, the Oklahoma Director of the Department of Corrections issued Policy Statement No. 7302.1, dated January 4, 1973, regarding the use of force, including chemical agents at all Oklahoma Correctional Facilities. 376 F.Supp. at 413. This statement, like Maryland's DCR 115–2, also required the use of only that force which was reasonably necessary under all attendant circumstances. With regard to gas, however, the requirement was more precise: "In controlling or moving an unruly prisoner, sufficient personnel were to be used to preclude the necessity for striking or inflicting bodily injury. Gas was not to be used on an individual prisoner except to prevent serious injury or loss of life." 376 F.Supp. at 414. The guidelines for implementing the policy also set forth the following priorities in the use of force:

1) Physical restraint
2) Show of force
3) Use of physical force other than weapons fire (Riot Squads)
4) Use of high pressure water
5) Use of chemical agents
6) Fire by selected marksman
7) Use of full fire power

376 F.Supp. at 414. Even if Mister thought that Thomas did have a weapon, unless that

---

**4.** With reference to the earlier incident on August 20, 1976, in which four officers had been injured by inmates, Officer Heiss referred to it as "quite a fracas down there" and indicated that gas may have been used on that occasion.

weapon were a gun, it would seem that other means such as high pressure water, if available, would have served to disarm him, especially since his threats were directed against Mister (on the other side of the bars) rather than McCargo who was in the cell with him.

 Since the Court finds that Officer Mister acted improperly in spraying tear gas on inmates McCargo and Thomas, there remains the issue of assessing damages. There being no clear evidence that plaintiffs suffered any property damage or loss as a result of Officer Mister's actions, damages will be assessed on the basis of the pain and suffering caused by the tear gas incident. Plaintiffs McCargo and Thomas testified to the injuries and discomfort they experienced as a result of exposure to the tear gas. Their faces were burned and within a day or so after the incident the skin on their faces peeled off altogether. Having found that this incident was unnecessary, this Court assesses damages against the defendant in the amount of $500.00 payable to Thomas McCargo, and $500.00 payable to George Thomas, the total amount of damages equaling $1000.00.

Accordingly, it is this 19th day of December, 1978, by the United States District Court for the District of Maryland, ORDERED:

1. That the judgment be, and the same is, hereby entered against the defendant in the amount of $500.00 as to each plaintiff; and

2. That a copy of this Memorandum and Order be sent to the plaintiffs and to the Attorney General for the State of Maryland.