Ronald G. PETERSON, et al., Plaintiffs,

v.

Paul J. DAVIS, et al., Defendants.

Civ. Nos. H–81–1124, H–81–1174, H–81–
1209, H–81–1234, H–81–1336, H–81–
1448, H–81–1597 and H–81–2510.

United States District Court,
D. Maryland.

Nov. 26, 1982.

James J. Nolan, Jr., Baltimore, Md., for plaintiffs.

Richard B. Rosenblatt, Asst. Atty. Gen., Baltimore, Md., for defendants.

ALEXANDER HARVEY, II, District Judge:

This consolidated civil action is the result of the use of tear gas by prison officers to quell a late night disturbance in a dormito-ry of the Maryland House of Correction (the "MHC"). Claiming that their constitutional rights were violated by prison officials, various prisoners have filed civil actions in this Court seeking damages and other relief under 42 U.S.C. § 1983. Named as defendants in these suits are the former Warden of the MHC and various State correctional officers.

Eight actions in all were filed by eleven different inmates.[1] All eight actions were assigned to one judge of this Court and were consolidated for all purposes pursuant to Rule 42(a), F.R.Civ.P. Counsel was appointed by the Court to represent the plaintiffs, and an Order was entered certifying the case as a class action under Rule 23, F.R.Civ.P., the class to consist of all persons who were occupants of J Dormitory at the MHC on the night of April 11, 1981. Following various preliminary proceedings, a second amended complaint was eventually filed naming as additional defendants three Maryland State police officers.

A pretrial conference was subsequently held pursuant to Local Rule 35. Thereafter, an Order was entered granting the motion for summary judgment filed on behalf of the three State police officers who had been named as defendants. Thus, when the case came on for trial, there were seven defendants remaining in the suit. These defendants include Howard Lyles (Assistant Commissioner of the Division of Correction), Paul J. Davis (Warden at the MHC), Harold A. Kane (Assistant Warden), Major Richard E. Vernon, Captain Joe A. Klyce, Captain Donald Holland and Captain Joe Wilson (the latter three being correctional officers at the MHC or at nearby State penal institutions).[2]

Pursuant to the Pretrial Order, it was agreed that the liability issues would be tried first and, depending on the outcome,

---

1. The eight pending actions are Civil Nos. H–81–1124, H–81–1174, H–81–1209, H–81–1234, H–81–1336, H–81–1448, H–81–1597 and H–81–2510. The plaintiffs in these actions are Ronald G. Peterson, Michael Wright, Herbert Hilton, Melvin Foster, Ellis R. Douglas, Jr., William S. Joyner, John S. Lomax, Alvin J. Thomp-son, Clarence Bey, Omawale T.A. Kerriem and Lawrence Bell.

2. The positions mentioned in parentheses are those held by these defendants at the time of the incident in question.

questions of damages would be reserved for a later trial. The case came on for trial before the undersigned judge sitting without a jury. Various witnesses testified and numerous exhibits were admitted in evidence. This Court's findings of fact and conclusions of law, under Rule 52, F.R. Civ.P., are embodied in this opinion, whether or not expressly so characterized.

## I

### The claims

Plaintiffs' claims arise as a result of a disturbance occurring in J Dormitory of the MHC during the night of April 11–12, 1981. The MHC is a medium security prison, operated by the Division of Correction of the Department of Public Safety and Correctional Services of the State of Maryland.[3]

On the night in question, there were approximately 119 inmates housed in J Dormitory. Inmate George Kensler had been ordered to report to the Warden early in the evening but had refused to do so. Repeated orders to the same effect were likewise ignored by Kensler, and when some twenty to twenty-five inmates gathered around him in support of his position, Warden Davis decided to take action to prevent a major disturbance. A tactical squad under the leadership of Major Richard E. Vernon was summoned, as were several State police officers. Armed with tear gas and other riot gear, correctional officers and State police officers stationed themselves around J Dormitory around midnight and Kensler was ordered to come out. When he again refused, inmates who did not wish to be participants in the disturbance were invited to leave the Dormitory. When no one left nor moved toward the entrance to the Dormitory, tear gas was discharged into the Dormitory, as were at least a few multi-batons.[4] The action taken by the prison offi-

cials was successful in causing Kensler and the other inmates to leave the Dormitory. When they filed out, they were handcuffed and removed to another area of the prison. Several days later, they were returned to J Dormitory after it had been decontaminated.

As a result of this incident, plaintiffs claim under 42 U.S.C. § 1983(1) that defendants subjected plaintiffs to excessive force on the night of April 11–12, 1981, in violation of their Eighth Amendment and Fourteenth Amendment rights; (2) that when plaintiffs were removed from J Dormitory and placed in another area of the MHC, they were subjected to cruel and unusual punishment resulting from the unconstitutional conditions of confinement to which they were subjected, in violation of their Eighth Amendment rights; (3) that plaintiffs sustained serious and painful injuries as a result of the tear gassing incident and that defendants were deliberately indifferent to their serious medical needs, in violation of their Eighth Amendment rights; and (4) that plaintiffs lost items of personal property during the incident and the period of detention which followed, in violation of their Fourteenth Amendment rights.[5]

Defendants deny that acts undertaken by them resulted in any infringement of the constitutional rights of inmates confined in J Dormitory. They assert that they were justified in using tear gas and multi-batons on the night in question. Defendants further contend that even if their acts were unlawful, they are protected from liability in this case by the doctrine of qualified immunity because the acts in question were performed in the course of defendants' official duties and with the good faith belief that the acts in question were reasonable under all the circumstances.

---

**3.** An extensive description of the MHC and its various components is contained in this Court's opinion in *Johnson v. Levine,* 450 F.Supp. 648, 651–652, 654–661 (D.Md.1978).

**4.** A multi-baton is a device which fires a wooden, cylindrical pellet, designed to sting but not otherwise injure the person struck.

**5.** In their second amended complaint, plaintiffs also sought relief under 42 U.S.C. § 1985. Defendants' oral motion under Rule 41(b) to dismiss this claim was granted after the plaintiffs had completed the presentation of their evidence at the trial.

## II

### The facts

▉ Both sides called witnesses who were present at or near the scene on the night of April 11–12, 1981. Five inmates testified, as did three of the defendants.[6] Much of the testimony was sharply conflicting, and in finding the facts, the Court has given due regard to the credibility of the witnesses and the weight their testimony deserves. Each of the prisoners who testified has previously been convicted of one or more serious criminal offenses. It is well established that the prior conviction of a witness of a felony or other serious crime is pertinent to an inquiry concerning the credibility of that witness. *United States v. Frazier,* 418 F.2d 854 (4th Cir.1969); *United States v. Pennix,* 313 F.2d 524, 531 (4th Cir.1963). In determining the weight to be accorded the testimony of the plaintiffs, this Court has therefore considered their prior convictions as well as the substantial stake they have in the outcome of the case.

After considering both the direct and cross-examination of witnesses called both by the plaintiffs and by the defendants, this Court concludes that the testimony of the defendants was in general much more convincing than that of the plaintiffs.[7] The versions presented by the defendants were in general corroborative of each other and were further supported by various exhibits admitted in evidence. As found by the Court, the facts are as follows.

In March of 1981, the Maryland State Department of Public Safety and Correctional Services was rocked by personnel changes at the highest level. Secretary Gordon C. Kamka resigned under pressure from the Governor, as did Edwin R. Goodlander, Commissioner of the Division of Correction. These officials had been criticized for their lenient approach to the operation of Maryland prisons, and it was expected by State prisoners that the successors to Kamka and Goodlander would restrict inmate activities, and make prison conditions even more onerous than they had been. As a result, there was a certain amount of unrest among the prisoners, both at the MHC and at the nearby Brock Bridge Correctional Facility,[8] also located at Jessup.

On April 11, 1981, members of the Inmate Advisory Council told Warden Davis that a prisoner work stoppage was planned to take place at the MHC on Monday, April 13. An investigation revealed that inmate George Kensler, who resided in Dormitory J, was one of the ringleaders of this movement. Kensler had previously been involved in various disturbances and violent activities at the MHC.[9] Kensler had been observed within the previous day or so as being in the center of a large group of inmates in the gymnasium during the recreation period.[10]

At the same time, there were rumors of unrest and a possible disturbance at nearby Brock Bridge. Correctional officers who were in training in connection with the forthcoming opening of the new Annex[11] had been placed on stand-by status on Friday, April 10, in anticipation of trouble at Brock Bridge. To handle this rumored disturbance, a tactical unit of some twenty-five officers had been formed under the leadership of Major Richard Vernon, and included Captain Joseph Wilson and Cap-

---

6. In addition, it was stipulated that the deposition of defendant Klyce, taken on April 21, 1982, and the deposition of defendant Davis, taken on May 6, 1982, would also be a part of the record in this case.

7. In particular, the Court has credited substantially all of the testimony of Major Vernon, an experienced correctional officer who made an impressive witness.

8. This facility is adjacent to the MHC in Jessup, Maryland, and is operated by the Maryland Correctional Pre-Release System.

9. According to Captain Klyce, these violent activities had included stabbings and cuttings.

10. This meeting was perceived by the Warden to be "unusual" because it occurred in the gymnasium.

11. The so-called Annex is now known as the Maryland Correctional Institution—Jessup.

tain Donald Holland, who, like Major Vernon, are defendants in this case. Each member of this unit had been equipped with full riot gear, including helmets, tear gas grenade launchers, gas masks and batons.

April 11, 1981 was a Saturday. Captain Joe Klyce was the weekend Shift Commander (the senior officer in charge) at the MHC. He came on duty at 3:30 P.M. that Saturday afternoon. Because of the possibility of trouble that weekend, Warden Davis himself came to the MHC on Saturday at approximately 8:30 P.M. Davis summoned Klyce and told him that he wanted to see certain inmates and, in particular, George Kensler. Klyce contacted the inmate housing area and arranged for a pass to be given to Kensler to come down to the Warden's office. Shortly thereafter, Klyce was notified that Kensler had said that he was not going anywhere until somebody explained why he was wanted.

At around 9:15 P.M., Klyce himself went to J Dormitory. Kensler was paged and came forward into the day room to talk to Klyce. Some twenty to twenty-five inmates came out of the Dormitory area and stood behind Kensler as he was talking to Klyce. Upon being told that the Warden wanted to see him, Kensler refused to go with Klyce, stating that if the Warden "wants to see me, he will have to come up here." Referring to the other inmates around him, Kensler also said, "This is an organization that is composed of ten heads and a body" and "no part of it went any place without the other." When Klyce repeated his order that the prisoner accompany him to the Warden's office, Kensler again refused to go. Concluding that Kensler was the leader of a group of some twenty-five to thirty inmates, Klyce decided that in view of the number of prisoners involved, he would have to make other arrangements to carry out the Warden's order.

Klyce then returned and reported to the Warden concerning what had transpired in J Dormitory. Upon receiving this report, the Warden at around 9:30 P.M. decided that more drastic action would be required to have Kensler brought to him. Major Vernon and his tactical unit had earlier been brought from Brock Bridge to the MHC in anticipation of possible trouble at the latter institution. A meeting was arranged, attended by Major Vernon, Captain Klyce, Warden Davis, Assistant Warden Kane, Assistant Warden Nuth and Major Brown (Klyce's superior). Events of the past several days involving inmate Kensler were reviewed. The determination was made that a belligerent and clandestine organization existed in J Dormitory and that this organization, led by inmate Kensler, constituted a danger to the normal operation and safety of the institution and its population. It was agreed that Kensler and his followers could not be permitted to defy the Warden's order and that prompt and decisive action was necessary to avoid a larger disturbance. As a result of the discussions at this meeting, a plan of action was agreed upon by those in attendance.[12]

It was decided that a show of force would be first employed to require Kensler and his followers to leave the Dormitory. Major Vernon's tactical unit would be used to surround the Dormitory, together with several State police officers with dogs, the so-called K–9 units. Kensler would be ordered to leave. If he refused, other inmates would then be invited to leave the Dormitory peacefully. These non-participants were to come out of the Dormitory, go down the stairs to the ground floor, across the South Wing and into the old recreation area, where Major Brown was to be waiting.[13] A disturbance would be declared as to those inmates remaining in the Dormitory, and the officer in charge, Major

---

12. Warden Davis also consulted by telephone with defendant Lyles, Assistant Commissioner of the Division of Correction, before the plan was implemented. Lyles concurred with the plan as adopted.

13. The regular detail was split. A portion of it was assigned to the old recreation area to receive the non-participants when they left the Dormitory. Others were sent to the Dormitory to assist in the handling of the recalcitrants.

Vernon, would then be authorized to use tear gas and multi-batons to force the prisoners who remained to leave the Dormitory.

Between 10:00 and 10:30 P.M., the usual bed check of J Dormitory was made. Video monitoring of the Dormitory indicated that lights were being unscrewed by inmates around 11:00 P.M., thus placing the Dormitory in substantial darkness. The tactical squad and the State Police support units were briefed, and shortly after midnight, approximately twenty-five to thirty correctional officers and State Police officers surrounded J Dormitory. They were equipped with full riot gear, including tear gas grenade launchers and multi-batons. The officers deployed themselves on the catwalk surrounding the Dormitory, and the outside lights were turned on so that they were in full view of the inmates. Captain Klyce then went to the gate and called for Kensler to come out. Kensler came to the vicinity of the gate, as other inmates shouted, "Don't go out, they're trying to trick you, gas you. They are going to make the dogs bite you." Kensler did not come out.

Major Vernon then used a bull horn to order Kensler to come out. Again Kensler refused. At this point, Major Vernon made an announcement inviting all non-participants to leave the Dormitory. This announcement was repeated for a second time. After a wait of some two to three minutes, no inmates came forward to the gate to leave the Dormitory and none were even observed moving towards the entrance. Major Vernon thereupon announced that a disturbance was under way and ordered the firing of tear gas and multi-batons.

Some thirteen rounds of tear gas were fired. Although some ten rounds of multi-batons were fired, only one or two of the wooden pellets actually entered the Dormitory itself.[14] For several minutes, general confusion reigned in J Dormitory. Many of the inmates ran into the showers and secured wet towels to put over their faces. Others stated "We give up" and moved to

the gate of the Dormitory. The inmates were then ordered to leave in single file, and as they came to the gate, each was handcuffed and moved to the old shower room in the basement area of the MHC. Later on that Sunday morning, the prisoners were moved to the old recreation area of the MHC. Cots were secured from the Army, and the former occupants of J Dormitory stayed in the old recreation area for several days. They were finally moved back to J Dormitory on Tuesday, April 14, after it had been decontaminated.

There were no injuries of any consequence suffered by any of the inmates involved in this disturbance. One man who had panicked out of fear was immediately sent to the hospital. Several others were treated for minor injuries at University Hospital and at the MHC. Doctors were on call following the incident, and a nursing staff was on duty. No correctional officers were injured in any way, and there was no destruction of State property. Disciplinary action was taken only against Kensler and one other inmate, Stanley Dukes, both of whom were placed that night in punitive segregation.

### III

*The claim of excessive force*

■ It is well established that the unjustified infliction of bodily harm upon a prisoner by a correctional officer gives rise to liability under 42 U.S.C. § 1983. *King v. Blankenship,* 636 F.2d 70, 72 (4th Cir.1980); *Johnson v. Glick,* 481 F.2d 1028 (2d Cir.), *cert. denied,* 414 U.S. 1033, 94 S.Ct. 462, 38 L.Ed.2d 324 (1973). An actionable claim of this sort is generally considered to stem from a violation of the Eighth Amendment's proscription against cruel and unusual punishment, although some cases have ascribed such a cause of action to a denial of due process of law under the Fourteenth Amendment. *King v. Blankenship, supra* at 72.

---

14. Most of the wooden projectiles that were fired struck the fencing surrounding the Dormitory, and a pile of them was later found on the catwalk outside the Dormitory.

In the *King* case, the Fourth Circuit specifically held that the unjustified infliction of bodily harm upon a prisoner gives rise to liability under § 1983 on the part of one who, acting under color of state law, engages in such conduct without just cause. 636 F.2d at 72. However, the Court recognized that not every instance of the use of excessive force gives rise to a cause of action under § 1983, and that the phrases "unjustified" and "without just cause" in the rule must be read with reference to the Eighth and Fourteenth Amendments and not to state tort law. *Id.* at 73. In the *King* case, the Fourth Circuit approved the test for determining when the excessive use of force gives rise to a cause of action under § 1983 formulated in *Johnson v. Glick, supra.* In that case, Judge Friendly said the following (at 1033):

> In determining whether the constitutional line has been crossed, a court must look to such factors as the need for the application of force, the relationship between the need and the amount of force that was used, the extent of injury inflicted, and whether force was applied in a good faith effort to maintain or restore discipline or maliciously and sadistically for the very purpose of causing harm.

When this test is applied here, this Court finds and concludes that plaintiffs are not entitled to a recovery from the defendants in this case because of the application of excessive force on the night of April 11–12, 1981. The evidence does not support plaintiffs' contention that force was applied here maliciously and sadistically for the purpose of causing harm to the inmates in J Dormitory. On the contrary, there was good reason for the action taken by prison officers. An inmate had flagrantly defied repeated orders which came directly from the Warden of the institution. This defiance was heard by a large number of other prisoners in the Dormitory, and the inmate was even supported in his stand by a group of some twenty to twenty-five other inmates residing in the Dormitory. Before action was taken by prison officials, various alternatives were discussed by the Warden and his advisers. The plan which was finally agreed upon included the use of limited force only as a last resort. It was that plan which was later carried out in a good faith effort to restore discipline in J Dormitory.

The extent of injury inflicted was minimal. No correctional officers were injured, and only minor injuries were sustained by a few of the 119 inmates housed in the Dormitory on the evening in question. There were no broken bones, no open wounds and minimal medical treatment was required. No prisoner was injured by the one or two wooden projectiles fired into the Dormitory. The amount of tear gas used was not excessive under all the circumstances. It is true, of course, that inmates were made uncomfortable by the tear gas for a short period of time. However, this discomfort and inconvenience must be weighed against the risk of serious injury to guards and prisoners had the Dormitory been entered in force by correctional officers. There was no loss or destruction of state property, and only minimal loss to the property of inmates as a result of this disturbance.

Plaintiffs argue that there was no need under the circumstances to discharge tear gas into the Dormitory, and that therefore the amount of force used exceeded what was required to accomplish the objective sought by prison officials. This Court would disagree. Warden Davis was faced with a potentially serious disturbance. A sit-down strike was reportedly planned for Monday, April 13. Available evidence indicated that Kensler was the leader of those who had planned to engage in this activity. It was therefore necessary to act promptly and decisively to nip the planned uprising in the bud by removing Kensler from the Dormitory. However, the problem was a difficult one because there were some 119 inmates in the Dormitory, and twenty to twenty-five actively supported Kensler. Even in riot gear, correctional officers and State police entering the Dormitory to force the removal of Kensler would have subjected themselves to physical harm and would certainly have inflicted injuries on inmates who attempted to prevent Kensler's removal. Thus, as a last resort, tear gas was used

to accomplish the removal of inmates from the Dormitory with the least amount of injury to persons or property.

Plaintiffs contend that innocent bystanders were unnecessarily tear gassed on the evening in question. But the record does not support this assertion. Non-participants were given ample opportunity to leave the Dormitory before tear gas was discharged. On two separate occasions, the invitation was extended for non-participants to leave peacefully. Although the testimony was conflicting as to the length of time that expired between the last such announcement and Major Vernon's order to fire tear gas,[15] this Court finds that some two to three minutes in fact elapsed between those times. There was therefore ample time for innocent non-participants to come to the gate and leave the Dormitory had they wished to do so. However, during the period in question, no one came forward to leave, and there was not even any movement by prisoners to approach the gate. Whether or not this was because of a fear of Kensler and his supporters, those who were in the Dormitory and who did not come forward can hardly now complain when they did not avail themselves of the reasonable opportunity afforded them to avoid the tear gassing. Plaintiffs make much of the fact that when the tear gas was discharged into the Dormitory, the exit gate was locked. But the evidence indicates that the gate is operated electronically. A correctional officer was present to open the gate by merely pushing a button, and had anyone come forward, it is clear that the gate would have been opened promptly and the inmate in question would have been permitted to leave immediately.

Pointing out that all or substantially all of the inmates in J Dormitory were black, plaintiffs further assert that the prison officers on the night of April 11 acted maliciously and with the intent to punish black inmates at the MHC. But the evidence presented does not support the assertion that acts of the officers on the night in question were racially motivated. Tear gas was chosen for use under the circumstances so that order might be restored in J Dormitory with as little injury to persons and property as possible. The racial composition of the Dormitory was in no way causally related to defendants' use of tear gas.[16]

In support of their claims in this case, plaintiffs rely on the testimony of Captain Joe A. Klyce, one of the defendants. Captain Klyce was of the opinion that force should have been used to remove Kensler from the Dormitory. He would not have fired any tear gas, but would have used four to six officers and two K–9 units to forcibly remove the recalcitrant inmate Kensler. This alternative was discussed by Captain Klyce with Warden Davis and Assistant Warden Kane, and again later when Captain Klyce participated in the meeting at which the final plan was adopted. Captain Klyce's views were considered by the others, but ultimately another approach was agreed upon by his superiors. That different correctional officers had differing views concerning the most appropriate means for accomplishing the desired end is hardly convincing proof that excessive force was used by defendants on the night of April 11. Captain Klyce's proposals were not carried out, and no one can now say how many prisoners and correctional officers would have been injured or the extent of their injuries if an attempt had been made to remove Kensler from the Dormitory by force, including the use of K–9 units.[17] Whether the plan finally adopted was the best under all the circumstances, it was an entirely reasonable approach to the problem presented, and it in fact accomplished the ultimate objective with no serious injuries or property damage resulting.

**15.** Estimates of this time interval ranged from thirty seconds to five minutes. Plaintiff Wright was the witness who gave the five-minute estimate.

**16.** According to Captain Klyce, 85% of all the inmates at the MHC are black.

**17.** In *Murphy v. Pomerleau,* 676 F.2d 693 (4th Cir.1982), Baltimore City police officers had entered inmates' cells with dogs in an attempt to restore order at the Baltimore City Jail. Several inmates sustained multiple dog bite wounds requiring treatment at a hospital.

The testimony of Captain Klyce therefore does not lead this Court to conclude that excessive force was used by the defendants on the night in question.

Plaintiffs' reliance on *McCargo v. Mister,* 462 F.Supp. 813 (D.Md.1978), is misplaced. In that case, Judge Young of this Court found that the constitutional rights of two state prisoners had been infringed when tear gas was sprayed into their prison cell without justification. As Judge Young found from the evidence presented in that case, the two prisoners were locked "securely behind bars and could not create a serious disturbance." 462 F.Supp. 819. The facts here were quite different. Kensler, the leader of a belligerent group of inmates, had repeatedly and openly defied a specific order of the Warden. Some twenty to twenty-five other inmates had actively supported Kensler's defiance of the Warden, and a total of 119 inmates in all were present in the Dormitory on the night in question. The potential for a serious disturbance was obviously present, and defendants acted knowing that they faced a high risk of a riot if Kensler was forcibly removed. Tear gas was used as a last resort only after a show of force by correctional officers proved unsuccessful.

Under appropriate circumstances, various courts have approved the use of tear gas and mace against unruly or disruptive prisoners. In *Bell v. Wolfish,* 441 U.S. 520, 546, 99 S.Ct. 1861, 1878, 60 L.Ed.2d 447 (1979), the Supreme Court noted that "maintaining institutional security and preserving internal order and discipline are essential goals that may require limitation or retraction of [prisoners'] retained constitutional rights * * *" In *Landman v. Peyton,* 370 F.2d 135 (4th Cir.1966), the Fourth Circuit approved the use of tear gas to subdue recalcitrant prisoners and did not disturb the finding by the District Court that the use of tear gas in the Virginia State Penitentiary on twelve or fifteen occasions in the course of a year was a constitutional and legitimate exercise of disciplinary authority by prison officials. The Tenth Circuit in *Poindexter v. Woodson,* 510 F.2d 464, 466 (10th Cir.1975), *cert. denied,* 423 U.S. 846, 96 S.Ct.

85, 46 L.Ed.2d 68 (1975), held that tear gas and fire hoses were properly used to quell· a prison disturbance, finding that the trial court had given adequate consideration to prevailing and prior circumstances and to the discretion vested in prison officials. In *Clemmons v. Greggs,* 509 F.2d 1338 (5th Cir.1975), the Court held that the ill-advised use of tear gas does not violate the Eighth Amendment absent a showing of an intent to inflict punishment on inmates. In *Washington v. Anderson,* 387 F.Supp. 412 (E.D. Okla.1974), the Court held that mace was properly used on female inmates who refused to leave the recreation room after being ordered many times to do so. Other cases approving the use of tear gas under appropriate circumstances include *Greear v. Loving,* 391 F.Supp. 1269 (W.D.Va.1975); *Ray v. Rockefeller,* 352 F.Supp. 750 (N.D.N.Y. 1973); *Simmons v. Russell,* 352 F.Supp. 572 (M.D.Pa.1972); and *Beishir v. Swenson,* 331 F.Supp. 1227 (W.D.Mo.1971).

When the test approved by the Fourth Circuit in *King v. Blankenship, supra,* is applied here, this Court finds and concludes that the constitutional line was not crossed by defendants on the night of April, 1982. As the Supreme Court observed in *Bell v. Wolfish, supra* 441 U.S. at 547, 99 S.Ct. at 1878, the problems that arise in the day-to-day operation of a prison are not susceptible of easy solutions, and prison officials must be accorded deference in the adoption and execution of policies and practices needed to preserve internal order and discipline. The plan adopted by prison officials on the night of April 11 and later put into effect was a reasonable response to the situation presented and was a good faith attempt to restore order and discipline at the MHC. Accordingly, plaintiffs have failed to sustain their claim that they were subjected to the excessive use of force on the night in question.

In any event, defendants in this case have met their burden of proving their entitlement to qualified immunity from liability, as recognized in *Procunier v. Navarette,* 434 U.S. 555, 561, 98 S.Ct. 855, 859, 55

L.Ed.2d 24 (1978). In view of all the surrounding circumstances of this case, the defendants did not know, nor should they reasonably have known, that the actions they took would violate plaintiffs' constitutional rights. *Wood v. Strickland,* 420 U.S. 308, 322, 95 S.Ct. 992, 1000–01, 43 L.Ed.2d 214 (1975). As discussed hereinabove, the plan which ultimately resulted in the use of tear gas in J Dormitory was adopted after consideration of various alternatives. Whether an objective or a subjective good faith test is applied, defendants would be entitled to immunity here because they could not have known that what they did under these circumstances would be a constitutional violation, even were this Court to conclude (as it has not) that such a violation had occurred. *See Harlow v. Fitzgerald,* —— U.S. ——, 102 S.Ct. 2727, 73 L.Ed.2d 396 (1982).

For these reasons, plaintiffs' claim that their constitutional rights have been infringed because of the use of excessive force by defendants on the night of April 11 has not been proven.

### IV

#### *Other claims*

■ On the record here, plaintiffs' other claims must likewise fail. Plaintiffs complain that they were subjected to cruel and unusual punishment when they were confined in the old recreation area of the MHC following their removal from J Dormitory. There is no merit to this contention. Plaintiffs were housed in the old recreation area of the institution for only some two or three days. They slept there on Army cots. The evidence indicates that what the defendants furnished plaintiffs during this short period of time in the way of food, clothing, shelter and other amenities was reasonably adequate under the circumstances, and did not violate plaintiffs' constitutional rights.

Until J Dormitory could be decontaminated, there was simply no other place where these 117 inmates could be housed, in view of the overcrowded conditions which have existed at the MHC for some time. *Johnson v. Levine, supra.* In one breath, plain-

tiffs contend that they endured onerous conditions of confinement in the old recreation area. But in the next, they complain that there was some lingering tear gas still present in J Dormitory when they were returned there on Tuesday, April 14. This Court finds and concludes that defendants acted with reasonable promptness in decontaminating J Dormitory and in returning plaintiffs to their assigned place of abode. Plaintiffs have not met their burden of proving that their constitutional rights were violated when they were confined in the old recreation area of the MHC for a period of several days.

■ It is next claimed that many plaintiffs were injured as a result of the incident and that defendants were deliberately indifferent to plaintiffs' serious medical needs on the night in question and for several days thereafter. To recover for inadequate or improper medical care, a prisoner must establish that prison authorities were deliberately indifferent to the prisoner's serious medical needs. *Estelle v. Gamble,* 429 U.S. 97, 104–05, 97 S.Ct. 285, 291–92, 50 L.Ed.2d 251 (1976). The mere failure to treat all medical problems to a prisoner's satisfaction, even if that failure amounts to medical malpractice, is insufficient to support a claim under § 1983. *Id.* at 107, 97 S.Ct. at 292. Methods of diagnosis and choice of treatment of an inmate are therefore not subject to judicial review. *Webster v. Jones,* 554 F.2d 1285 (4th Cir.1977); *Russell v. Sheffer,* 528 F.2d 318 (4th Cir. 1975).

■ The evidence presented at the trial indicates that only minor injuries were sustained by some of the 119 inmates who were subjected to tear gas on the night in question. Some suffered eye irritations, while others had skin rashes. The evidence discloses that adequate treatment was afforded to those suffering from these minor ailments. During the incident, plaintiff Peterson pulled a muscle in his back. However, the Court finds that his medical claims were highly exaggerated, and his testimony does not establish that defendants were de-

liberately indifferent to his medical needs. Plaintiff Day complained of irritation to his eyes and a rash resulting from the tear gas. However, he was treated for these complaints. Day went to sick call on Sunday, April 12, and subsequently went to the hospital for medical treatment. He conceded that the medication prescribed by a doctor helped his medical problems. Plaintiff Wright also went to University Hospital and was treated for an eye irritation. Plaintiff Kelly complained of a rash, which he claimed was not treated for several weeks. However, on April 15, when he went to University Hospital for treatment of an ear problem, he did not mention his skin rash and did not ask to see a dermatologist. Inmate Kensler himself, who had been removed to punitive segregation when he left the Dormitory, was treated for an eye irritation at 1:15 A.M. that same morning. Inmate Stanley Dukes, who was also placed on punitive segregation, was seen at 1:50 A.M., and he stated that he did not need treatment because he had no injuries. As a precautionary measure, the correctional officer who visited Dukes washed his eyes.

These facts do not indicate that defendants were deliberately indifferent to the plaintiffs' medical needs which resulted from the tear gassing incident. At most, plaintiffs' complaints amount to no more than a claim that treatment was delayed. However, in view of the large number of inmates involved, quite obviously everyone with complaints could not be seen at the same time at sick call on Sunday morning, April 12. Any delay in the treatment rendered for plaintiffs' minor injuries was not deliberate, but was caused by the large number of inmates involved in the disturbance. For these reasons, this claim must likewise fail.

Finally, plaintiffs contend that their constitutional rights were infringed as a result of the loss by some of them of items of personal property. In particular, plaintiff Joiner testified that he lost some of his legal papers and personal possessions as a result of the incident. The evidence indicates that J Dormitory was locked when all the inmates were removed on the night in question. When the Warden inspected the Dormitory the next day, it was in the same kind of order that would normally be expected, except that it was not occupied by prisoners. Thereafter, the prison sanitation officer with a detail of men returned to the Dormitory, mopped the floors and collected bed linens for laundering. As soon as the area was decontaminated, the inmates were moved back.

These facts do not establish that plaintiffs' constitutional rights were infringed when certain items of personal property were missing upon the inmates' return to their regular quarters in J Dormitory several days after the incident. There is no evidence that defendants participated, either directly or indirectly, in the loss of plaintiffs' property. The missing items were few in number and no more than might be expected following a prison disturbance of this sort. Warden Davis acted reasonably in securing the Dormitory and in having it cleaned up so that the inmates might be promptly returned from the old recreation area. Accordingly, plaintiffs are not entitled to any recovery in this case because of the loss of a few items of personal property.[18]

V

*Conclusion*

For the reasons stated, this Court finds and concludes that on the record here there is no merit to any of the claims asserted by the plaintiffs in this case under 42 U.S.C. § 1983. Judgment is accordingly entered in favor of the defendants.

18. In any event, it is doubtful that plaintiffs can assert in this Court any claim that their loss of personal property amounted to a constitutional deprivation under § 1983. *See Parratt v. Tay-* lor, 451 U.S. 527, 101 S.Ct. 1908, 68 L.Ed.2d 420 (1981), and *Juncker v. Tinney*, 549 F.Supp. 574 (D.Md.1982).